**Nicholas F. PAPANICOLAOU, et al., Plaintiffs,**

v.

**CHASE MANHATTAN BANK, N.A., Defendant.**

No. 88 Civ. 4117.

United States District Court, S.D. New York.

Aug. 15, 1989.

Kreindler and Kreindler, by Paul S. Edelman (Stanley D. Bernstein and Todd J. Krouner, of counsel), New York City, for plaintiffs, Nicholas F. Papanicolaou, et al.

Milbank, Tweed, Hadley and McCloy, by Edward J. Reilly (Richard C. Tufaro, of counsel), New York City, for defendant, Chase Manhattan Bank, N.A.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr.,
District Judge.

On May 25, 1989, the partner at Milbank, Tweed, Hadley and McCloy who was in charge of the defense of this action discussed the merits of this case with the plaintiff for an hour and a half outside the presence of the plaintiff's counsel. The partner admits that he violated Rule 4.2 of the American Bar Association Model Rules of Professional Conduct, although he states that he did not think it applied.[1] The plaintiff has now moved to disqualify both the responsible partner and his law firm from participating any further in this action. For the following reasons, the Court concludes that the partner's conduct warrants the granting of the relief requested.

### Background

The underlying controversy between the parties involves allegations of fraud with respect to a settlement agreement entered into by the plaintiff after he defaulted on loans extended to him by the defendant. On May 25, 1989, the plaintiff arrived at Milbank's offices to attend a deposition, which had ended earlier that day. The plaintiff encountered the responsible Milbank partner in the firm's reception area. They exchanged pleasantries and the plaintiff asked the partner how the case was going. The conversation immediately became sensitive, and the plaintiff suggested the two go to a conference room. The

---

**1.** *See infra.* Rule 4.2 of the American Bar Association Model Rules of Professional Conduct, adopted in 1983, is virtually identical to Disciplinary Rule 7–104(A)(1) of the ABA Model Code of Professional Responsibility (and its New York equivalent), which is the rule the Milbank partner actually admitted violating. *See* ABA Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct* Rule 4.2 Model Code Comparison, at 79 (1984).

partner agreed. The resulting meeting, which was joined about twenty minutes later by one of the defendant's employees, lasted an hour and a half.

The Court offered to hold a hearing to ascertain exactly what was said during the meeting but counsel for both parties expressed the opinion that the court should decide the matter without a hearing. The affidavits of the plaintiff and the Milbank partner conflict with respect to the content and import of their conversation;[2] but it is not disputed that the two argued the merits of the case at length, that the plaintiff showed the responsible partner a certain document meant to refute key defense testimony, and that the partner disparaged the competence of the plaintiff's attorneys, the law firm of Kreindler and Kreindler.

Immediately after the meeting took place, the plaintiff told his lawyers what had happened. The following day, May 26, the partner in charge of the litigation at Kreindler wrote to his counterpart at Milbank and accused him of improperly obtaining privileged information regarding the plaintiff's litigation strategy as well as with irreparably marring Kreindler's relationship with its client. The Kreindler partner asked that Milbank and its partner both withdraw from the case. Both refused. The Milbank partner argued in a responsive letter that the plaintiff had disclosed no information not already known, and that any litigation strategy the plaintiff might have imparted would have come out anyway in his papers opposing the defendant's forthcoming motion for summary judgment. The plaintiff, concluded the Milbank partner, had suffered no prejudice. This motion to disqualify followed. In response to the motion Milbank has removed the responsible partner and four other attorneys from this case and built a "Chinese wall" around them.

*Discussion*

In the Preamble to the Model Rules of Professional Conduct the American Bar Association Commission on the Evaluation of Professional Standards described a "Lawyer's Responsibilities":

> A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.

> $\cdot$   $\cdot$   $\cdot$   $\cdot$   $\cdot$

> A lawyer's conduct should conform to the requirements of the law.... A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it....

ABA Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct* Preamble, at 9 (1984). A responsible advocate acts zealously to further his client's interests. Yet "the conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an upright person" often raises ethical problems. Like the New York State Code of Professional Responsibility, the Model Rules of Professional Conduct "prescribe terms for resolving such conflicts." *Id.* at 10.

■ Courts, of course, exist to resolve disputes, and not to discipline lawyers who come before them. *See Lefrak v. Arabian Am. Oil Co.*, 527 F.2d 1136, 1141 (2d Cir. 1975) ("To conduct the broad investigation sought here, aside from its irrelevancy to the remedy of disqualification, in effect transforms the trial judge into the Grievance Committee of the bar association which is certainly not his function."); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976); *United States Football League v. National Football League*, 605 F.Supp. 1448, 1463 n. 31 (S.D.N.Y.1985); *cf. Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.

---

**2.** For instance, the plaintiff asserts that the Milbank partner goaded him on and threatened him with negative press coverage at trial—and revenge later—if he continued to pursue the suit. *See* Affidavit of the plaintiff ¶¶ 3, 9, 13, 14, 19 (May 30, 1989). The Milbank partner, in contrast, insists that the conversation remained cordial, save, perhaps, for the plaintiff's comment that "Chase would destroy its relationship with the entire Greek shipping community if it went forward with [the] case." Affidavit of the responsible Milbank partner ¶ 26 (June 8, 1989).

1975). At the same time, however, a district court has a "duty to supervise members of its bar." *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 131 (2d Cir.1976); *Hull, supra*, 513 F.2d at 571; *see* General Rule 4(f) of the United States District Courts for the Southern and Eastern Districts of New York.[3] Although courts should pause before depriving a party of the counsel of its choice, disqualification is appropriate when a lawyer's conduct might taint the case. In general, then, a district judge should disqualify the offending counsel when the integrity of the adversarial process is at stake. *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979).

It follows that a violation of professional ethics rules does not alone trigger disqualification, *see W.T. Grant, supra*, 531 F.2d at 677; *Meat Price Investigators Ass'n v. Spencer Foods, Inc.*, 572 F.2d 163, 165 (8th Cir.1978);[4] rather, a trial judge should primarily assess the possibility of prejudice at trial that might result from the attorney's unethical act. As the Second Circuit wrote in *Hull v. Celanese Corp.*, however, courts must remember that

> [t]he preservation of public trust both in the scrupulous administration of justice

and in the integrity of the bar is paramount. Recognizably important [is the plaintiff's] right to counsel of her choice.... [That] consideration[ ] must yield, however, to considerations of ethics which run to the very integrity of our judicial process.

513 F.2d at 572; *cf. Nyquist, supra*, 590 F.2d at 1246; *Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 571 (S.D.N.Y.1987). Therefore, "any doubt is to be resolved in favor of disqualification." *Hull, supra*, 513 F.2d at 571.

Different ethical rules warrant different cures when breached. Attorneys who violate Canons 4 or 5 of the ABA Code of Professional Responsibility[5] are paradigmatic candidates for disqualification; attorneys who breach other canons are less often disqualified. *See Nyquist*, 590 F.2d at 1246. The rationale behind the Second Circuit's rule is that violations of Canons 4 and 5, by their very nature, give rise to a high probability that taint of trial—the real litmus test—might occur.[6] When an attorney violates Canon 4, for example, by successively representing opposing sides of an ongoing dispute, the attorney is in a position to use the confidences gained through

---

**3.** General Rule 4(f) of the United States District Courts for the Southern and Eastern Districts of New York provides as follows:

If, in connection with activities in this court, any attorney is found guilty by clear and convincing evidence, after notice and opportunity to be heard, of conduct violative of the Codes of Professional Responsibility of the American Bar Association or the New York Bar Association from time to time in force, the attorney may be disciplined by this court....

**4.** Because the Rules of Professional Conduct are "partly obligatory and disciplinary and partly constitutive in that they define a lawyer's professional role," ABA Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct* Scope, at 11 (1984), courts in this Circuit should look to them for guidance in determining whether a case might be tainted by the participation of an attorney or firm guilty of an ethical lapse. *See, e.g., Hull v. Celanese Corp.*, 513 F.2d 568, 571 n. 12 (2d Cir.1975) (looking to ABA Model Code of Professional Responsibility); *NCK Org., Ltd. v. Bregman*, 542 F.2d 128, 129 n. 2 (2d Cir.1976) (same); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 n. 2 (2d Cir.1977) (same); *cf. Yaretsky*

*v. Blum*, 525 F.Supp. 24, 28 (S.D.N.Y.1981). The authority of the Model Code devolves upon the Model Rules, which incarnate, in many respects, the relevant provisions of the Code. As regards the rules herein, the Model Rules and the New York Code of Professional Responsibility do not contain material variances.

**5.** Canon 4 provided: "A lawyer should preserve the confidences and secrets of a client." (Canon 4 may have inspired the current Rule 1.9, which addresses instances of serial representation.)

Canon 5 provided: "A lawyer should exercise independent judgment on behalf of a client." (Canon 5 has been reconstituted as Rule 1.7.)

Canons 4 and 5 frequently operated in conjunction with Canon 9: "A lawyer should avoid even the appearance of professional impropriety." A violation of Canon 9 alone almost never warranted disqualification. (Canon 9 has not been preserved in the Model Rules, though it remains in force in the New York Code of Professional Responsibility.)

**6.** Note that the standard for disqualification is whether a trial *might* be tainted. *See Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973); *Hull, supra*, 513 F.2d at 572.

# 1084

prior conferences with a former client. A lawyer's breach of Canon 4 unquestionably taints the legal process. *See id.* at 1246; *Hull, supra,* 513 F.2d at 572; *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953). Similarly, a breach of Canon 5, such as when an attorney attempts concurrently to represent a party to a lawsuit while continuing to act as a counsel to the opposing party in other matters, will probably taint the trial because of the lawyer's inability to serve conflicting loyalties. *Nyquist, supra,* 590 F.2d at 1246; *see also Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 230 (2d Cir.1977). In those situations, disqualification is clearly appropriate.

■ The Milbank partner who met with the plaintiff violated Model Rule 4.2 (the equivalent of Canon 7's Disciplinary Rule 7–104(A)(1)).[7] Model Rule 4.2 provides:

> *Communication with Person Represented by Counsel*
>
> In representing a client, a lawyer shall not communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Model Rule 4.2 serves several vital ends. *See United States v. Guerrerio,* 675 F.Supp. 1430, 1437 & n. 14 (S.D.N.Y.1987); ABA Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct* Rule 4.2 comment, at 79 (1984); G. Hazard & W. Hodes, *The Law of Lawyering* 434 to 438.2 (1988); *see also* American Bar Foundation, *Annotated Code of Professional Responsibility* 331–39 (1979) [hereinafter *Annotated Code* ]. It guarantees fairness in the adversarial system. It prevents unprincipled attorneys from exploiting the disparity in legal skills between attorney and laypeople. It preserves the integrity of the attorney-client relationship. The Rule also protects "opposing lawyers as well as opposing parties. Lawyer B may have two reasons for not wanting his client to speak to Lawyer A alone. The obvious reason is fear that the client will damage his case by making unwise voluntary statements.... Another reason is fear that the lawyer's own tactics will be compromised, and that his own reputation will suffer as a result." G. Hazard & W. Hodes, *supra,* at 434–35; *see Annotated Code, supra,* at 332–33.[8] Although breaches of Model Rule 4.2 might not *necessarily* require disqualification (in contrast to the Canons 4 and 5 situations), courts considering violations of the Rule cannot abdicate their roles as guarantors of fair process. If a lawyer's violation of Model Rule 4.2 might taint the trial, the lawyer should be disqualified.

In this case, the plaintiff has pointed to several examples of interpretation, analysis, and strategy that he discussed with the

---

7. Canon 7 provided: "A lawyer should represent a client zealously within the bounds of the law."

8. Ethical Consideration 7–18 provided:

> The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has the consent of the lawyer for that person....

The comment to Disciplinary Rule 7–104 explained:

> [T]he purpose of a blanket prohibition against lawyers discussing even with a willing adverse party the subject matter of the controversy in the absence of that party's counsel [is] to preserve the proper functioning of the attorney-client relationship and to shield the adverse party from improper approaches.... [T]he rule is designed to prevent opposing counsel from impeding an attorney's performance.... [T]he scope of the rule therefore extends even to well-intended approaches....

> [T]he imbalance in knowledge and skill between a lawyer and a lay adverse party may cause even well-intended acts of the lawyer to have a coercive impact on the party and to induce the party to disclose privileged information. On the other hand, the information that the lawyer obtains from communications with an unrepresented adverse party may lead the lawyer to take into account the situation or circumstances of that party, which would dilute his zeal in representing his client. Arguably, moreover, the rule facilitates the settlement of disputes by placing them in the hands of those who are professionally trained to make dispassionate comments.

Milbank partner at the May 25 meeting. The plaintiff contends that his case will be irreparably prejudiced should this privileged information be available to the defendant and its counsel. The Milbank partner responds that given the exhaustive discovery in the underlying litigation, none of the disclosed information was new to him. Furthermore, he argues, the plaintiff would soon have had to reveal his theories anyway in answering the defendant's forthcoming motion for summary judgment. Therefore, the responsible partner concludes, the plaintiff—an intelligent and sophisticated businessman—did not suffer the prejudice that might support the partner's disqualification.

In *Zeller v. Bogue Electric Manufacturing Corp.*, No. 71 Civ. 5502 (RO) (S.D.N.Y. Mar. 11, 1975), Judge Owen rejected a lawyer's contention that he had not violated DR 7–104(A)(1) when he obtained information he would have received soon anyway. Where the parley's substance went to the nub of the lawsuit, Judge Owen held, the attorney had to be disqualified "to protect [the adverse party] from any unfair advantage [the attorney] *might* have achieved by the improper meeting." *Id.* at 5–6 (emphasis added); *see also Yaretsky v. Blum*, 525 F.Supp. 24, 29 (S.D.N.Y.1981). Disciplinary Rule 7–104 (hence Model Rule 4.2) "quite clearly puts the responsibility on the attorney to avoid such meetings," *Zeller, supra,* slip op. at 6, and the plaintiff's accomplishments do not relieve the responsible partner of his obligation to comply with the rules of ethics.[9]

The Court finds little to distinguish the Milbank partner's violation of Model Rule 4.2 from violations of Canons 4 and 5, which require disqualification. Here, an hour and a half conference discussing the merits of an ongoing lawsuit was held with the opposing party without the presence of his counsel. A ten or fifteen minute conference with a former client on a prospective lawsuit would constitute clear grounds for disqualification under Canon 4.

The Court assumes, without so finding, that at their meeting the plaintiff explicitly or implicitly disclosed to the responsible partner privileged information on litigation strategy.[10] (These disclosures passed through the responsible partner to the four other Milbank lawyers). The Court also assumes that the firm's voluntary disqualification of these lawyers has stanched that information's flow. In any event, the Chinese wall erected around the responsible partner and the four other Milbank attorneys here was clearly warranted in order to "preserv[e] [the] public trust both in the scrupulous administration of justice and in the integrity of the bar." *Hull, supra,* 513 F.2d at 572.[11]

The plaintiff's request, however, is broader. It is that the entire Milbank firm be disqualified. In deciding whether to disqualify a firm, a court must consider the same criteria as it would in deciding whether to disqualify an individual attorney. *See Hull, supra;* G. Hazard & W. Hodes, *supra.* If the firm's presence might taint this case, Milbank must be disqualified.[12]

*Annotated Code, supra,* at 332–33.

**9.** The Milbank partner relies on *W.T. Grant Co. v. Haines, supra,* in support of his position. In *W.T. Grant,* however, the party who met with the attorney had not yet retained a lawyer and chose to speak without one; also, the attorney with whom the party spoke represented the party's employer and was entitled to make such inquiries. Most importantly, the court found that no prejudice had resulted from the meeting. The *W.T. Grant* court itself distinguished the case before it with those involving a party known to be represented by counsel. *See* 531 F.2d at 675–77.

**10.** *Cf., e.g., United States Football League, supra,* 605 F.Supp. at 1462 (submission under court seal may mitigate problem of disclosure at pub-

lic hearing of confidential information). In this case, both Kreindler and Milbank have turned down the chance for a hearing. *See* Transcript of oral argument at 32–34 (June 8, 1989). Accordingly, this Court's decision is not based on one.

**11.** *Cf. Niesig v. Team I,* App.Div., 545 N.Y.S.2d 153, 160 (2d Dep't 1989) ("an attorney who violates DR 7–104(A)(1) is subject to disqualification, as well as disciplinary sanctions").

**12.** In opposing the plaintiff's motion, Milbank cites a California decision in which the appellate court upheld an individual attorney's disqualification for violating a provision similar to Model Rule 4.2 but reversed the trial court's disqualification of the entire firm, *Mills Land &*

Within days after the May 25 meeting took place, Milbank took steps to separate the responsible partner, and the four other attorneys with whom he discussed the meeting, from the rest of the firm. Milbank argues that this "Chinese wall" will protect the plaintiff from further harm and that disqualifying the firm will only prejudice their client.

Milbank employees have spent almost seven thousand five hundred hours working on this case and have reviewed more than thirty-five thousand pages of documents. Deposition transcripts total almost six thousand pages. Forty-one subpoenas have been issued. According to the responsible Milbank partner, he and another attorney have done about thirty percent of Milbank's work. Milbank argues that permitting it to remain on the case, while isolating only the attorneys privy to the meeting's substance, would ensure that the information the plaintiff disclosed remain with the responsible partner and those whom the partner spoke, thereby protecting the plaintiff. At the same time, the rest of Milbank's team could continue their work on the case—thereby ensuring, as Milbank puts it, that the sins of the lawyers not be visited on the client. *See W.T. Grant Co. v. Haines, supra,* 531 F.2d at 677.

■ Milbank's proposal is supported by cases involving the use of Chinese walls, which are designed to prevent the harms arising from instances of imputed knowledge of privileged information. In general, those cases hold that when an individual lawyer learns privileged information, a court may presume that the attorney shares thoughts with his or her colleagues, consciously or unconsciously. Thus, when one attorney is infected with privileged information, the other attorneys at the firm are presumed to become contaminated and must also be disqualified.[13] *See Hull, supra,* 513 F.2d at 570; *Huntington, supra,* 655 F.Supp. at 572; *Fund of Funds, supra,* 567 F.2d at 234. This presumption of shared knowledge among attorneys in a firm is rebuttable. *See Yaretsky, supra,* 525 F.Supp. at 29; *Huntington, supra,* 655 F.Supp. at 572. However, courts have held that the sworn word of an infected attorney or his or her allegedly uninfected colleague that there was no cross-pollination between them is not a satisfactory rebuttal, *Huntington, supra,* 655 F.Supp. at 575–56; *EZ Painter Corp. v. Padco, Inc.,* 746 F.2d 1459, 1462 (Fed.Cir.1984); courts have even gone so far as to state that even the most rigorous self-discipline on the part of the infected attorney might not prevent him or her from unconsciously exploiting confidential information. *Emle Indus., Inc. v. Patentex, Inc., supra,* 478 F.2d at 571.

■ A firm can sometimes rebut the presumption of shared knowledge and thus avoid disqualification if it shows that it implemented effective prophylactic measures to insulate an infected attorney. *See*

Water Co. v. Golden West Refining Co., 186 Cal. App.3d 116, 230 Cal.Rptr. 461 (1986) (citing *Chronometrics, Inc. v. Sysgen, Inc.,* 110 Cal. App.3d 597, 168 Cal.Rptr. 196 (1980)). The case is inapposite. To begin with, the "client" in *Mills* was a deposed corporate officer who at the time of the meeting with opposing counsel had not even known that a lawsuit existed, and who had never met with his own company's lawyer. As a result, there was no showing at all that information had passed to the opposing counsel, much less members of the opposing counsel's firm. Here, in contrast, the Milbank partner has admitted discussing the merits of the case with the plaintiff.

*Mills* is distinguishable for a second, and simpler, reason. As the *Mills* court itself explained, it was *forced* to decline to follow what it called the "expansive" federal court standard—because the federal standard, exemplified in the Second Circuit's decision in *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975), was inconsistent with California precedent. As noted above, the Second Circuit stressed in *Hull* that doubts about the propriety of disqualification must be resolved in favor of the moving party. *See* 513 F.2d at 571.

13. Disciplinary Rule 5–105(D) of the Model Code of Professional Responsibility provided:

If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate or any other lawyer affiliated with him or his firm, may *accept or continue such employment.*

In contrast, Model Rule 1.10 requires disqualification of a lawyer's colleagues only if the lawyer violates one of four other rules, none of which apply here.

*Armstrong v. McAlpin,* 625 F.2d 433, 445 (2d Cir.1980) (*en banc*), *vacated on other grounds and remanded,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 225–26 (6th Cir.1988); *cf. Cheng v. GAF Corp.,* 631 F.2d 1052, 1057–59 (2d Cir.1980), *vacated on other grounds and remanded,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Yaretsky, supra,* 525 F.Supp. at 29–30; *United States Football League, supra,* 605 F.Supp. at 1466; *LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252, 258–59 (7th Cir.1983). The Chinese wall is one such method of quarantine. When the wall has been put into place a court generally appraises the wall and decides whether its structure has assured impenetrability and that the presumption of shared knowledge in a firm is thereby successfully rebutted. *See Yaretsky, supra,* 525 F.Supp. at 30; *United States Football League, supra,* 605 F.Supp. at 1466 n. 35; *LaSalle, supra,* 703 F.2d at 257; *Schiessle v. Stephens,* 717 F.2d 417, 421 (7th Cir.1983).

■ In some cases, courts have found Chinese walls too porous. *E.g. Cheng, supra,* 631 F.2d at 1058; *Yaretsky, supra,* 525 F.Supp. at 30. Other courts have found that the walls were not timely erected. *E.g. United States Football League, supra,* 605 F.Supp. at 1466–67; *Huntington, supra,* 655 F.Supp. at 575; *EZ Painter, supra,* 746 F.2d at 1462.[14] It is the question of timeliness that remains troubling here. Although Milbank claims that it built its Chinese wall immediately after it received the Kreindler partner's faxed letter, one day after the meeting, in a letter he sent five days after the meeting the Milbank partner still refused to withdraw from the case. The Milbank partner imparted the news he learned to at least four other attorneys, and in the course of litigation both scuttlebutt and official information travel quickly by word of mouth. This Court doubts whether any Chinese walls, which are meant to be preemptive, can ever function effectively when erected in response to a motion, and not prior to the arising of the conflict. *Cf. EZ Painter, supra,* 746 F.2d at 1462; *Armstrong, supra,* 625 F.2d at 436, 445.

A Chinese wall seems an inappropriate prophylactic here for another reason. Chinese walls are meant to isolate a client's confidences. Chinese walls are not designed to, and are not able to, contain the effects of deprecation. Model Rule 4.2 protects parties from the potential consequences of the possession of confidential information; but it also sustains the integrity of the relationships between both an attorney and his client and an attorney and his opponent. The responsible Milbank partner disparaged Kreindler's competence. His comments are alleged to have upset the equilibrium of the relationship between Kreindler and its client, the plaintiff. In the conduct of litigation it is essential that the attorney have the full confidence of his client. Attorney-client relationships are delicate and may never fully recover from such attacks.[15] According to Kreindler, the partner has also made it difficult for the firm to maintain a normal, professional adversarial relationship with Milbank. If the relationship between the attorneys in this case has deteriorated to the extent that plaintiff's counsel cannot feel secure, the course of the trial may well be affected, with resulting adverse consequences for the plaintiff. Accordingly, the Court concludes that Milbank should be disqualified.

### Conclusion

In order to protect the integrity of this dispute, this Court orders that:

1. Milbank, Tweed, Hadley and McCloy shall be disqualified from any further par-

---

**14.** One court has suggested that where a law firm labors under a conflict of interests, a Chinese wall might never be effective. *See Fund of Funds, supra,* 567 F.2d at 229 n. 10.

**15.** Milbank argues that the plaintiff's visit to his attorneys' office immediately after the meeting demonstrates just how resilient the plaintiff's attorney-client relationship remained. That argument is unconvincing. It is just as likely that the plaintiff saw his lawyers in despair or in a confrontational mood as it is that he went in order to assist his attorneys with the information gleaned from Milbank.

ticipation in this matter as of the commencement of its partner's meeting with the plaintiff on May 25, 1989.

2. Unless the parties agree otherwise, the May 31 deposition of Costas Los of Martran Shipping and the June 5 deposition of Thomas Sherwood of Oryx Communications Corp. shall be deleted from the record and those depositions retaken if desired. The deposition of Bernard Pariot shall remain on the record.

3. The defendant shall have thirty days from the date of this order to secure new counsel and sixty days after retaining new counsel for that counsel to become familiar with this case. Milbank shall relinquish to the new counsel all its work product generated in this matter up to the time of the May 25 meeting, including but not limited to all documents produced by the defendant and received from the plaintiff in discovery, all documents drafted for the case, all correspondence, and so forth. New defense counsel shall be prepared to go forward with this case by November 5, 1989.

IT IS SO ORDERED.