PROFESSIONAL SERVICE INDUSTRIES, INC., Plaintiff,

v.

W. David KIMBRELL and Janet Kimbrell, Defendants.

No. 90–1326–C.

United States District Court, D. Kansas.

March 6, 1991.

---

William A. Bonwell, Jr. and Susan Ellis, Bonwell, Foster, Irby & Ellis, David E. Bengston and William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, Kan., John J. Thomason of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, Tenn., for plaintiff.

Paul L. Thomas, Wichita, Kan., Dennis J. Dobbels and David A. Welte of Polsinelli, White, Vardeman & Shalton, Kansas City, Mo., John Jurcyk, Jr., McAnany, Van Cleave & Phillips, Pa., Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion of defendant W. David Kimbrell to disqualify John J. Thomason, Jerry E. Mitchell and the law firm of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams from representing the plaintiff in this case. At the court's notice, an evidentiary hearing was set for February 21, 1991. Two days before the hearing, movant asked for a continuance in order that he might conduct discovery on his motion which was filed December 6, 1990. The continuance was denied during a telephone conference on the afternoon of February 19, 1991. On February 21, 1991, the court heard the parties' evidence and arguments on the motion. After reviewing the parties' additional briefs, the court will issue for purposes of this motion only its findings and conclusions as required by *Fullmer v. Harper*, 517 F.2d 20, 21–22 (10th Cir.1975).

## FINDINGS OF FACT

1. Hall–Kimbrell Environmental Services, Inc. ("Hall–Kimbrell"), an environmental engineering company, started business in 1982. W. David Kimbrell founded Hall–Kimbrell and served as its president, CEO, and chairman of the board until December of 1989.

2. Between 1982 and 1989, Hall–Kimbrell was one of the fastest growing corporations in the United States. With the passage in 1986 of "AHERA," Asbestos Hazard Emergency Response Act, 15 U.S.C. § 2641 *et seq.*, Hall–Kimbrell contracted with numerous school districts to inspect and develop management plans for controlling and removing asbestos in their school buildings.

3. In the fall of 1989, David and Janet Kimbrell were two of seven principal shareholders in Hall–Kimbrell who were approached by Professional Service Industries, Inc. ("PSI") and its parent corporations, Professional Service Industries Holding, Inc. and ADIA/Inspectorates, Inspectorate International, Ltd. (a Swiss company), about PSI's possible purchase of Hall–Kimbrell. On December 29, 1989, David Kimbrell, who owned in excess of 70% of the shares in Hall–Kimbrell, and the other six shareholders of Hall–Kimbrell executed a stock purchase agreement selling their stock to PSI. The sale of Hall–Kimbrell became effective on July 1, 1990.

4. The stock purchase agreement provided that the former shareholders, including David Kimbrell, would execute individual employment agreements with PSI that would insure their employment with Hall–Kimbrell for at least one year after the sale. David Kimbrell retained his position as president of Hall–Kimbrell until his termination in July of 1990.

5. In March of 1990, the Denver office of the Environmental Protection Agency ("EPA") filed and served one or two formal complaints or citations against Hall–Kimbrell. Mark Weiland, corporate counsel for PSI; Robert W. Naibert, corporate counsel for Hall–Kimbrell; and John Thomason, outside retained counsel for PSI, met in Lawrence in March and April of 1990 and drafted an answer to these complaints. In early May, the EPA filed ten more complaints against Hall–Kimbrell. No other defendants or parties are named in the complaints. The EPA complaints primarily focused on Hall–Kimbrell's failure to inspect wallboard in the school buildings.

6. Harold Ahlberg, chairman of Professional Service Industries Holding, Inc., asked David Kimbrell to provide a written report of the history to these EPA problems and his recommendations concerning these particular complaints. David Kimbrell gave his report in a five-page letter dated May 18, 1990, and sent copies to five other members of the management team on the EPA complaints. The letter summarized the ongoing dispute with the EPA on the requirement of inspecting the sheetrock, drywall or wallboard in schools for asbestos material and suggested various actions for defusing this controversy.

7. On May 18, 1990, David Kimbrell received a memorandum from James Ahlberg, president of PSI, requesting his attendance "at a planning meeting to discuss

the company's strategy for defending the referenced [EPA] complaints," scheduled for 2:00 p.m. to 7:00 p.m. on Thursday, May 24, 1990. The memorandum was also addressed to Sal Falcone and Richard Sanfilippo, employees of Hall–Kimbrell; Murray Savage, Chief Financial Officer of Hall–Kimbrell; Robert Naibert; Stan Stanley, President of PSI Holding; James Ahlberg; and Mark Weiland.

8. Those requested in the memorandum to attend were present at the meeting on May 24 and 25, 1990. In addition, John Thomason and Jerry Mitchell, attorneys with the firm of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams were present. Shortly after the meeting began, John Thomason introduced himself and Jerry Mitchell as attorneys representing PSI.

9. At the meeting, several persons, including David Kimbrell, made presentations. The specifics of each EPA complaint were discussed. The history of the EPA's position on this issue and the past dealings between the EPA and Hall–Kimbrell were other topics. The management team decided on a strategy for dealing with these complaints on several different fronts.

10. David Kimbrell, in his words, "bared his soul" at the meeting telling all about the past relationship, including the rocky moments, between the EPA and Hall–Kimbrell. He placed the current complaints in the chronology of the EPA's evolving position on wallboards. He identified the strong and weak points with the EPA complaints and offered his personal insights on handling them. He considered his comments confidential in the sense that they were not intended to inform the public or the EPA.

11. David Kimbrell did not know until he arrived at the meeting that attorneys would also be attending. He did not prepare or plan his presentation to the team in anticipation of obtaining legal advice upon what he presented. David Kimbrell did not testify that upon learning of the attorneys that he altered his presentation in any way. David Kimbrell did not testify that his statements and remarks at the meeting were induced or evoked as a result of the attorneys.

12. Others attending the meeting do not recall David Kimbrell disclosing anything more than what he already had wrote in his letter of May 18th or discussed at other times. David Kimbrell admitted that what he said at the meeting was already known by others at Hall–Kimbrell.

13. Neither John Thomason nor Jerry Mitchell nor anyone else at the meeting told David Kimbrell that his interests with respect to the EPA complaints were or could be adverse to Hall–Kimbrell or PSI, that they could not represent him in such matters, and that he may want to obtain independent legal representation.

14. None of those attending the meeting and testifying at the hearing, including David Kimbrell, perceived an adverse interest in regards to the EPA complaints between David Kimbrell, Hall–Kimbrell and PSI at the time of the meeting. PSI's attorneys in the present case did not represent PSI in the purchase of Hall–Kimbrell. There is no evidence showing John Thomason and Jerry Mitchell were aware of the terms to the stock purchase agreement before or during the May 24th and 25th meeting.[1]

15. David Kimbrell met John Thomason and Jerry Mitchell for the first time at this meeting. He never sought personal legal advice from them at any time. They had no private conversations about the EPA complaints or the matters alleged therein. The only occasion where David Kimbrell spoke with either attorney privately outside of the meeting was a brief, social conversa-

---

1. The notes of John Thomason and Jerry Mitchell were admitted at the hearing for the court's *in camera* inspection. The court has found nothing in those notes to suggest for purposes of this motion that counsel were contemplating a suit against David Kimbrell or were attempting to elicit confidential information from him for later use against him. The notes do not even reveal any undue focus on what David Kimbrell presented or said at the meeting. Whether the notes are protected as work product is an issue reserved for the Magistrate whenever it is raised during discovery.

tion in the hallway about a photograph or plaque hanging there. David Kimbrell believed that the attorneys were representing the management team and that he was a member of the team. During this period, David Kimbrell regularly sought the counsel of the law firm of Shook, Hardy & Bacon on his personal legal matters.

16. The law firm of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams has regularly represented PSI for the last five years. It has primarily provided litigation support services in PSI's major defensive litigation.

17. Within days after the May 24th and 25th meeting, PSI retained a law firm in Austin, Texas, to represent it on the EPA complaints. John Thomason and his firm did not provide any further representation on that matter after the meeting.

18. On July 5, 1990, Kimbrell was locked out of his office at Hall–Kimbrell and was served with a summons on this lawsuit filed the same day.

19. On September 4, 1990, Kimbrell's attorneys raised the conflict of interest issues found in the present motion in a letter faxed to John Thomason. In a letter dated September 10, 1990, Mr. Thomason responded that he found no merit in those issues and urged that they be brought before the court immediately if Kimbrell's attorney believed there was any merit to the issues.

## CONCLUSIONS OF LAW

1. As a result of Rule 407(c) in this court and Rule 226 of the Kansas Supreme Court, the Model Rules of Professional Conduct ("Model Rules") set forth the "standards of conduct and practice of the legal profession in Kansas." *Graham v. Wyeth Laboratories*, 906 F.2d 1419, 1421 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990).

2. The court generally supervises counsels' conduct in litigation before it, and decisions to disqualify counsel are committed to the court's sound discretion. *E.E.O.C. v. Orson H. Gygi Co. Inc.*, 749 F.2d 620, 621 (10th Cir.1984). At the same time, courts do not exist to discipline attorneys, but to resolve disputes. *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1082 (S.D.N.Y.1989). The movant has the burden of showing the grounds for disqualification. *F.D.I.C. v. Sierra Resources, Inc.*, 682 F.Supp. 1167, 1170 (D.Colo.1987). The courts in this district approach motions to disqualify conscientiously and conservatively:

> Disqualification of an attorney chosen by a party to represent him in a lawsuit is a serious matter. Courts have the inherent power to disqualify counsel where necessary to preserve the integrity of the adversary process.... However, each case must be decided on its own peculiar facts. *United States v. Standard Oil Co.*, 136 F.Supp. 345 (S.D. N.Y.1955).

> The immediate preventive measure sought by plaintiff is indicated only where the offending attorney's conduct threatens to "taint the underlying trial" with a serious ethical violation. *W.T. Grant Co. v. Haines*, 531 F.2d 671 (2nd Cir.1976). There are, in this Court, in the state of Kansas, and in every other state, detailed and pervasive rules and enforcement machinery to deal with ethical violations.

*Ramsay v. Boeing Welfare Ben. Plans Committee*, 662 F.Supp. 968, 969–70 (D.Kan.1987) (quoting *Field v. Freedman*, 527 F.Supp. 935, 940 (D.Kan.1981)). Motions to disqualify "should be reviewed with extreme caution for they can be misused as techniques of harassment." *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1577 (Fed.Cir.1984).

An ethical violation does not automatically trigger disqualification. *Papanicolaou*, 720 F.Supp. at 1083. The remedy for unethical conduct lies with the appropriate disciplinary machinery unless there exists the threat of tainting the trial. *Ramsay*, 662 F.Supp. at 970. The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances. *Id.* See also *Panduit*, 744 F.2d at 1577 (A court must maintain "the delicate balance"

between the need to uphold ethical standards and an individuals's right to counsel of his choice).

3. Kimbrell bases his motion to disqualify on four grounds: (1) Counsel have a conflict of interest; (2) Counsel failed to disclose their true client at the May 24th and 25th meeting; (3) Counsel will be necessary witnesses at trial; and (4) Counsel have reviewed Kimbrell's privileged documents.[2]

### CONFLICT OF INTEREST

■ 4. Under this ground, David Kimbrell alleges Model Rules 1.6 through 1.10 are violated. The conflict of interest rules were intended "to encourage communication between the client and attorney" and developed "to protect the former client." *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 728, 729 (11th Cir.1988). Model Rules 1.6 through 1.10 operate to safeguard the confidences of a "client." Consequently, the obvious first question is whether an attorney-client relationship ever existed between David Kimbrell and John Thomason or Jerry Mitchell.

5. The Model Rules are premised on the notion that the corporate entity is the attorney's sole client even though the attorney can only interact with his client through its various agents and officials. This is revealed in the following comments to Model Rule 1.13:

An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders and other constituents.

Officers, directors, employees and shareholders are the constituents of the corporate organizational client....

When one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected by Rule 1.6. Thus, by way of example, if an organizational

client requests its lawyer to investigate allegations of wrong-doing, interviews made in the course of that investigation between the lawyer and the client's employees or other constituents are covered by Rule 1.6. *This does not mean, however, the constituents of an organizational client are the clients of the lawyer.*

(emphasis supplied). "The basic precept of Rule 1.13 is that a lawyer representing an entity client does *not* thereby (and without more) become the lawyer for any of the entity's members, agents, officers, or other 'constituents,' as they are referred to in the rule; the lawyer instead represents the entity itself." 1 G. Hazard and W. Hodes, *The Law of Lawyering* § 1.13:102 at 387 (1990). Though simple in theory, this concept is difficult to apply since the client is a fiction and communications and transactions with it must occur through its agents.

■ 6. The Model Rules do not occupy the field on what constitutes an attorney-client relationship. Instead, the comments under the "Scope" section to the Model Rules make this question expressly dependent upon state substantive law for its answer. In Kansas, the relationship between an attorney and client is one of agency. *Bucher & Willis Consulting Engineers v. Smith*, 7 Kan.App.2d 467, 469, 643 P.2d 1156 (1982).

7. To meet the "client" threshold, David Kimbrell asks the court to find an implied contract. The Kansas Supreme Court has quoted the following general rule on an implied attorney-client relationship:

"The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in

**2.** At the hearing, Kimbrell's counsel announced that the third ground of his motion was withdrawn for now. The parties presented some conflicting testimony on the fourth ground, but none of the testimony showed that the attorneys

at issue had committed any ethical violation. This essentially was a discovery dispute that has been resolved. The court will only discuss the first two grounds.

matters pertinent to his profession." 7 Am.Jur.2d, Attorneys at Law § 118, pp. 187–88.

*In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984); see also *Wilson v. Wahl*, 182 Kan. 532, 322 P.2d 804 (1958), and *State v. Leigh*, 178 Kan. 549, 289 P.2d 774 (1955). In each of these cases, the attorney-client relationship was recognized because the client had sought and received personal legal advice from an attorney. In stark contrast, David Kimbrell never sought nor obtained the legal advice or assistance on any personal legal issue from John Thomason or Jerry Mitchell. At all times, Kimbrell's dealings with these attorneys were strictly in his capacity as president of Hall–Kimbrell. Unlike the Kansas case law, the attorneys here took no action directed exclusively to the purported client which resembles legal advice or assistance. The evidence offers no basis for inferring an implied contract.

8. Some courts in other jurisdictions have found agency law too narrow and, thus, have honored an implied attorney-client relationship when an individual submits confidential information to an attorney whom he reasonably believes is acting to further his individual interest. *Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1317–16 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Bobbit v. Victorian House, Inc.*, 545 F.Supp. 1124, 1126 n. 1 (N.D.Ill. 1982). David Kimbrell broadly construes this line of cases as holding that despite the absence of a formal and direct agreement, an attorney-client relationship may be formed when the purported client "has some interest of his own in common with others and is seeking to advance a common position." The court does not share defendant's expansive reading of those cases.

In *Westinghouse Elec. Corp.*, the court found that the association members were clients because each had disclosed information on the belief and expectation that this would enable the attorneys to perform legal services for it in furtherance of its interest. 580 F.2d at 1320; see *Nemours Foundation v. Gilbane, Aetna, Federal Ins.*, 632 F.Supp. 418, 423–24 (D.Del.1986) (same general rule applied there). This subjective approach focuses on whether the party divulging information has the intent to secure legal advice.[3] This can be determined from looking at the circumstances under which the confidences were disclosed and the nature of the work performed upon disclosure. *Trinity Amb. Serv. v. G & L Amb. Serv.*, 578 F.Supp. 1280, 1283 (D.Conn.1984). The Second Circuit in *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 749–50 (2nd Cir.1981), took a slightly different approach and treated all association members as vicarious clients of the attorney but limited disqualification to when the risks from this conflict were real.[4]

9. David Kimbrell's proof falls far short of establishing an attorney-client relationship even under the subjective approach. He is a sophisticated businessman who must be imputed with the knowledge of corporate workings and the primary role of counsel to a corporation. The attorneys were introduced as representing the parent corporation, PSI. He met these attorneys for the first time at a meeting attended by officials from both PSI and its subsidiary, Hall–Kimbrell. The meeting was called and organized to discuss the pending EPA complaints against Hall–Kimbrell. His contact with the attorneys was limited to

---

3. Though the focus is on the putative client's subjective intent, the belief in an attorney-client relationship must still be "reasonable." *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987); *Dalrymple v. Nat. Bank & Trust Co. of Traverse City*, 615 F.Supp. 979, 983, 984 (W.D.Mich.1985).

4. This court is not sure it is reasonable in this context to analogize an association and its members to a corporation and its agents. The for-

mer consists entirely of those sharing a common, limited interest, and the actions taken on behalf of the association would necessarily serve those limited interests of the individual members. By contrast, the latter is primarily a working relationship that has a common interest only when the individual is considered in his or her agent status. A closer analogy would be an association and its employees and a corporation and its agents.

formal group presentations and discussions during this meeting. There was no pretense made by anyone in the group that the attorneys were personally representing any of the individuals present. All of David Kimbrell's interactions with the attorneys was in his capacity as president of the subsidiary corporation. It is simply not reasonable for David Kimbrell to believe under these circumstances that he was personally represented by two attorneys because he made a group presentation to them and seven other management personnel from two corporations. This is not a case where the counsel has represented a close corporation over an extended period and one of the directors/shareholders believes counsel is also representing him individually. See *Rosman*, 653 F.Supp. at 1445; *Bobbit*, 545 F.Supp. at 1126. David Kimbrell has not met his burden of showing a present or former attorney-client relationship between him and the Thomason firm or any of its partners or associates.

### DISCLOSURE OF TRUE CLIENT

■ 10. David Kimbrell next contends the plaintiff's counsel violated Model Rule 1.13(d), which provides:

> In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

This Model Rule establishes a guideline of fairness for functioning with a legal fiction. When it becomes apparent that the interests of the corporate client and some of its constituents are no longer aligned and may even become adverse, the attorney must fairly inform the constituent that his only client is the corporation. Leading commentators on the Model Rules explain:

> In such situations it might be said that the lawyer's duty of diligent representation requires him to discover as much information as he can from a co-worker with interests potentially adverse to those of the entity, even if that person is

severely disadvantaged. However, although the lawyer's co-workers are not entitled to the full loyalty that a client deserves, they may have grown accustomed to treating the lawyer *as if* he owed full loyalty to them, and may not understand that he has served them *only* because they were serving the common master. Fairness therefore dictates that they not be lulled into confiding in someone who might become an *adversary's* lawyer. To learn confidences under false pretenses would be taking unfair advantage of non-clients, and must be avoided even if the information might be useful to the client.

1 Hazard & Hodes, § 1.13:501 at 430. Knowing this background, the application of Rule 1.13(d) to this case raises two interpretation questions. When is an attorney "dealing" with a corporate officer? Is a subjective or objective test used to determine when an adverse interest is "apparent?"

11. "Dealing" is a relatively broad and somewhat vague term. It has several possible meanings: "to traffic; to transact business; to bargain or trade. Also, to act between two persons, to intervene, or to have to do with." Black's Law Dictionary 399 (6th ed. 1990). As used in Rule 1.13(d), "dealing" is best defined as interaction between people at a level which can be termed as having to do or being concerned with one another. "Dealing" connotes personal and direct contact and, more particularly, a context where the working relationship between the officer and the attorney is such that the officer might be lulled into confiding because he reasonably believes the attorney is also representing him. The Comments accompanying Rule 1.13(d) supports this interpretation of "dealing:"

> There are times when the organizations' interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain in-

dependent representation. Care must be taken to assure that the individual understands that, when there is such adversity or (sic) interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

Whether such a warning should be given by the lawyer for the organization to any constituent individual may turn on the facts of each case.

Rule 1.13(d) was intended to require a *Miranda*-type warning when it was likely a corporate officer could be confused over whether the corporate counsel was likewise representing his interests.

12. The very same facts in this case which defeat an implied attorney-client relationship also preclude the notion of any "dealing." There was no personal or direct contact between David Kimbrell and the attorneys. Interaction was strictly confined to group functions. There was no setting in which David Kimbrell could reasonably believe he was confiding in attorneys for his own personal benefit. Mere presence at a single corporate business meeting hardly constitutes "dealing."

13. Answering the next interpretation question, an adverse interest is "apparent" when the lawyer "finds" or discovers a "conflict or potential conflict." Comments to Rule 1.13(d). This is a subjective test.[5] The attorney must have actual knowledge of the conflict or potential conflict. David Kimbrell has failed to carry his burden of showing the attorneys were aware of this conflict or potential conflict. There is no evidence that prior to the May meeting they were aware of the terms of stock purchase agreement or had contemplated suing David Kimbrell as a result of the EPA complaints. The temporal proximity between PSI's purchase of Hall–Kimbrell and the EPA complaints against Hall–Kimbrell creates some inference that the attorneys should have considered a suit against

David Kimbrell to indemnify PSI on these complaints. Since the standard is not an objective one and the court finds the testimony of the attorneys' entirely credible, there was no duty to give the *Miranda* warning under Rule 1.13(d).

14. Even assuming a violation of Rule 1.13(d), the appropriate remedy would not be disqualification. Counsel's continued representation does not carry the threat of tainting the trial or compromising the integrity of the adversarial process with a serious ethical violation. David Kimbrell's disclosure at the May meeting cannot be attributed in any respect to the presence of the attorneys. The fact the attorneys heard David Kimbrell's presentation and remarks does not give them a material advantage in prosecuting this suit nor does it prejudice Kimbrell in defending this suit. The information that Kimbrell related was already known by other employees of Hall–Kimbrell and presumably would have been available to the attorneys. David Kimbrell has not shown how it prejudices him for the attorneys to know that he was aware of the same information. The playing field is not so tilted as to deny David Kimbrell a fair trial in this case. See *W.T. Grant Co. v. Haines*, 531 F.2d 671, 676–78 (2nd Cir.1976).

IT IS THEREFORE ORDERED that David Kimbrell's motion to disqualify (Dk. 52) John J. Thomason and Jerry E. Mitchell and their law firm of Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams from representing the plaintiff in this case is denied.

---

**5.** The court in evaluating the credibility of testimony and evidence on this matter obviously considers its reasonableness.