ESSEX COUNTY JAIL ANNEX
INMATES, et al.,
Plaintiffs,

v.

James W. TREFFINGER,
et al., Defendants.

ESSEX COUNTY JAIL INMATES,
et al., Plaintiffs,

v.

James W. TREFFINGER,
et al., Defendants.

Nos. CIV. A. 87–871(HAA),
CIV. A. 82–1945(HAA).

United States District Court,
D. New Jersey.

Aug. 17, 1998.

Michael Marucci, Diana Johnston, Office of the Public Defender, Trenton, NJ.

Wayne J. Positan, Lum, Danzis, Drasco, Positan & Kleinberg, Roseland, NJ.

Catherine E. Tamasik, Essex County Counsel, Newark, NJ.

## *OPINION*

HAROLD A. ACKERMAN, District Judge.

## I. *INTRODUCTION*

This matter comes before the court on the defendants' motion to disqualify the plaintiffs' counsel, Susan Remis Silver, Esq., for alleged violations of the New Jersey Rules of Professional Conduct ("RPC"). The plaintiffs in these consolidated class action lawsuits are inmates at the Essex County Jail and Jail Annex. At the heart of this matter are very serious allegations that Ms. Silver, in her capacity as the plaintiffs' principal attorney, provided security sensitive information concerning specific staffing deficiencies at the Jail Annex to eight inmate representatives. This information was contained in a detailed memorandum which pointed out specific staffing deficiencies for each day over a span of fifty-three days. In addition, after she had assured this court that she recog-

nized the very important security concerns at the jail facilities, Ms. Silver provided an inmate with information concerning the date and time of his outside medical appointment. As will be discussed more fully below, these acts on the part of Ms. Silver were serious breaches of security at the Jail Annex. At best, these acts manifest Ms. Silver's utter lack of awareness and appreciation of the sensitive position she occupies in this litigation as the principal attorney for inmates at the Jail and Jail Annex. This court concludes that Ms. Silver's continued representation of the plaintiffs in these cases will impugn the integrity of these proceedings, and thus, the defendants' motion to disqualify her is hereby granted.

The two underlying class action lawsuits captioned above were filed on behalf of the inmates of the Essex County Jail and Jail Annex and allege that the conditions of confinement are unconstitutional. Each case was settled, and many aspects of jail operations have been governed by a series of consent orders. Since the initiation of these lawsuits, the plaintiffs have been represented by the State of New Jersey's Inmate Advocacy Unit.[1] Ms. Silver is the present Director of the Inmate Advocacy Unit and has been the principal attorney representing the plaintiffs in these cases since 1993.

On January 30, 1996, the defendants filed a notice of motion to disqualify Ms. Silver from further representation of the plaintiffs based on alleged violations of the New Jersey Rules of Professional Conduct. This court referred the defendants' motion to the Special Masters in this case, Bennet D. Zurofsky, Esq., and Frederic K. Becker, Esq. In a Report and Recommendation dated May 14, 1996, the Special Masters found, among other things, that although "there are facts which could support the argument that RPC 4.1(a)(1) and RPC 8.4(c) were both violated,"

*Report and Recommendation,* at 22, the defendants had nonetheless failed to demonstrate that Ms. Silver should be disqualified in this matter. Therefore, the Special Masters recommended that the defendants' motion be denied.

Subsequently, the plaintiffs, represented by the Office of the Public Defender, filed papers urging this court to affirm the Special Masters' conclusion that the defendants' disqualification motion be denied. The plaintiffs also objected to that portion of the Special Masters' report that concluded, at least implicitly, that Ms. Silver had violated RPC 4.1 and RPC 8.4. The plaintiffs argued that I should affirmatively find that Ms. Silver did not violate those rules.

The defendants opposed the plaintiffs' request for an affirmative finding that Ms. Silver did not violate RPC 4.1 and RPC 8.4. In addition, the defendants renewed their arguments in support of the motion to disqualify Ms. Silver.[2] After reviewing the Report and Recommendation, as well as the entire record relied upon by the Special Masters in deciding the motion, this court held a hearing on April 17 and 18, 1997 pursuant to Federal Rule of Civil Procedure 53(e) to determine whether to accept, reverse, accept in part, or reverse in part the Special Masters' recommendation.[3] Subsequent to the April, 1997 hearing, the defendants filed supplemental papers, in which they apprised the court of another incident in which Ms. Silver allegedly breached security measures at the jail facilities. After another round of briefing was permitted as to whether and in what manner this latest incident affected the disqualification motion, this court held another hearing on March 31, 1998 to address the issue.

This court has carefully reviewed all of the affidavits, certifications, and briefs submitted on this matter. This court also held

---

1. The Inmate Advocacy Unit was originally part of the New Jersey Office of the Public Advocate, and is now a part of the New Jersey Office of the Public Defender.

2. The defendants' objections to the Report and Recommendation were filed beyond the ten days permitted by Federal Rule of Civil Procedure 53. However, given the magnitude and sensitivity of the allegations at issue in the defendants' motion,

I permitted the parties to file their papers *nunc pro tunc.*

3. This court notes that although the Report and Recommendation was filed in May, 1996, a hearing was not held until approximately one year thereafter to accommodate Ms. Silver's leave of absence from the Public Defender's Office.

two hearings in which it had an opportunity to hear testimony from various witnesses. Furthermore, this court has scrupulously reviewed the Special Masters' Report and Recommendation. Based on this extensive review of the record, and in view of the sensitive nature of this litigation, this court is compelled to disqualify Ms. Silver as the plaintiffs' counsel in this case.

## II. *STANDARD OF REVIEW*

■ Federal Rule of Civil Procedure 53(e) specifies that in non-jury actions which have been referred to a special master,

> the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

Pursuant to this rule, it is well established that a special master's findings of fact will not be disturbed unless they are clearly erroneous. A finding of fact is clearly erroneous " 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*, 131 F.R.D. 63, 65 (D.N.J.1990) (reviewing decision of United States Magistrate) (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). However, a court must review a special master's conclusions of law under the *de novo* standard. *See Stauble v. Warrob, Inc.*, 977 F.2d 690, 693 (1st Cir.1992).

## III. *BACKGROUND*

The approximate inmate population at the Essex County Jail Annex in North Caldwell, New Jersey is between 1,300 and 1,400. The approximate number of corrections officers on duty at any given time is between 60 and 80. None of the corrections officers on duty carries a firearm of any sort. Inmates are not restrained by handcuffs or the like for significant periods of the day, and they are not separated from corrections officers by any barriers. Inmates are grouped together and housed in tiers or wings.

The procedures adopted at the Essex County Jail and the Jail Annex are geared towards maximizing security. Corrections officers at the Jail Annex are assigned to either custodial supervision or support operation. Each officer assigned to custodial supervision occupies a fixed post and oversees a group of inmates. Officers assigned to support operations do not occupy any fixed position, but rather provide relief to those assigned to custodial supervision and remain available to respond to emergencies which may arise from time to time. Because the support operation officers are not deployed to a fixed post, an inmate is generally incapable of discerning through personal observation the number of relief officers on duty at any given time. The defendants have described the salient effect of this procedure as a "carefully-cultivated uncertainty," which seeks to deter inmate misbehavior—attacks on other inmates or officers and escapes—by keeping them unsure as to when and where corrections officers may be in the vicinity. Moreover, while the inmate groups remain together for meals and recreation, intergroup communication is restricted to the greatest extent possible.

To maintain this "carefully-cultivated uncertainty," strict confidentiality of corrections officer scheduling information is required. Such schedules are prepared in the Central Scheduling Office and distributed only to the warden of the facility and the shift commanders.

Ms. Silver, in her capacity as the inmates' principal attorney in this litigation, authored a memorandum addressed ostensibly to the Special Masters, Lisa Martinez Wolmart, and all counsel, entitled "Officer Staffing Shortages that Result in the Inadequate Supervision of Inmates," which concerned the issue of officer staffing. The first paragraph of the memorandum succinctly describes its purpose:

I have prepared a chart based on the Officer Staffing Schedules at the Essex County Jail Annex. This chart demonstrates that there is a continuing problem with officer staffing shortages. The result is that tiers of inmates are left without any officer supervision for periods of time each day.

The memorandum consists of slightly over twelve single-spaced pages detailing numerous instances of staffing deficiencies. The memorandum provides in some detail the perceived deficiencies of officer staffing at the Jail Annex for each day between August 1, 1995 and September 22, 1995. Even a cursory review of this memorandum reveals that it contains quite sensitive information.[4] Although not indicated in the memorandum itself, Ms. Silver sent copies of this memorandum to eight inmate representatives under a cover letter dated September 29, 1995.

In a letter dated October 11, 1995, Ms. Silver admitted that she obtained the officer staffing schedules, which formed the basis of her memorandum, from a corrections officer outside of the normal discovery process. She would not, however, identify the corrections officer, although she did say that the officer had keys to the building where the schedules were maintained. After receiving the letter, the county retained independent counsel to investigate the circumstances surrounding Ms. Silver's acquisition of confidential staffing information. Based upon this investigation, the county concluded that Ms. Silver had obtained the staffing schedules from Corrections Officer Michael DeMeo, an employee of the county and the President of the Policeman's Benevolent Association ("PBA"), Local 157. The PBA office is located in the same administrative building in which the schedules were located. Corrections Officer DeMeo did not have authorized access to the schedules.

On December 6 or 7, 1995, Ms. Silver spoke by telephone to Martin Hellwig, the Essex County Director of Public Safety. Although Mr. Hellwig and Ms. Silver agreed that the conversation did take place and that the issue of the staffing schedules was discussed, they provided slightly different versions of other aspects of the telephone conversation in their respective certifications submitted to the Special Masters. In his certification, Mr. Hellwig described the event as follows in relevant part:

2. On or around December 7, 1995, I received a telephone call from Ms. Silver who wished to discuss the handling of inmates' incoming correspondence.

3. Unbeknownst to Ms. Silver, at the time of our conversation, I had before me a copy of her September 29, 1995 cover letter to eight inmates under which she enclosed a copy of a detailed memorandum also dated September 29, 1995 and purporting to highlight alleged custodial corrections officers staffing shortages. At the time of my conversation with Ms. Silver, however, I did not have copies of the scheduling memorandum which Ms. Silver provided to the eight inmates.

4. During our conversation, Ms. Silver assured, in response to my direct inquiry, that she had not provided any scheduling information to inmates. From the cover letter to inmates which I had before me, I knew that Ms. Silver's statements were false.

5. A day or two after our telephone conversation, Ms. Silver met with some of her clients at the Essex County Jail Annex in North Caldwell. Apparently, Ms. Silver learned during her meetings that the County was aware that she had provided scheduling information to inmates. Later that day, Ms. Silver visited my office in person and attempted to justify her false statements of the previous day. Ms. Silver took the position that all information set forth in her September 29, 1995 scheduling memorandum already was in possession of the inmates. She characterized the scheduling memorandum as having only the most "general" information. At the time of this conversation, I still did not have in my possession nor had I reviewed a copy of Ms. Silver's scheduling memorandum.

6. After my second conversation with Ms. Silver, I reviewed a copy of the scheduling memorandum which she sent to eight in-

---

4. By order of this court dated May 16, 1996, Ms. Silver's memorandum was sealed.

mates. The information is not "general" as Ms. Silver claimed. Rather, the information is quite detailed, specifying such things as when and where relief officers are deployed. This most certainly is not the type of information an inmate could glean through personal observation. I believe Ms. Silver's characterization of the scheduling information was deliberately misleading.

*Certification of Martin Hellwig*, January 23, 1996.

Ms. Silver's version of events is as follows in relevant part:

9. With respect to Martin Hellwig's certification submitted in support of the County's motion, Mr. Hellwig states that "[o]n or around December 7, 1995, I received a telephone call from Ms. Silver who wished to discuss the handling of inmates' incoming correspondence." (Hellwig Certification, para. 2).

10. Mr. Hellwig and I did not speak with each other on December 7, 1996 [*sic*]. We did have a telephone conversation on Wednesday, December 6, 1996 [*sic*], but at no point in time did we "discuss the handling of inmates' incoming correspondence."

11. My call to Mr. Hellwig on December 6, 1995, had absolutely no bearing on the issues before the Court that relate to either the plaintiffs' pending contempt application or to the issues that would later form the basis for the motion that I filed on December 21, 1995 for an order to protect inmates' rights to confidential attorney communications.

12. During my telephone conversation with Mr. Hellwig on December 6, 1995, he asked me the following question: "Did you ever send inmates copies of the Officer Staffing Schedules?"

13. I have never sent any Officer Staffing Schedules to inmates, and I answered Mr. Hellwig truthfully when I told him, "No, I have not." I also told Mr. Hellwig that I never would send Officer Staffing Schedules to the inmates.

14. I remember Mr. Hellwig's specific question, because I remember thinking that the way Mr. Hellwig asked me the

question, I could answer the question narrowly but truthfully.

15. Mr. Hellwig is incorrect when he states that I "assured [him] in response to [his] direct inquiry, that [I] had not provided any scheduling information to inmates." (Hellwig Certification, para. 4). Mr. Hellwig never asked me any general question about "scheduling information." He only had asked me the specific question about whether I had sent Officer Staffing Schedules to the inmates.

16. I did not provide information to Mr. Hellwig about the substance of my correspondence with my clients on officer staffing since this correspondence is an attorney/client privileged communication on an issue that is before this Court as part of the plaintiffs' contempt application.

17. Mr. Hellwig also told me in our telephone conversation on December 6, 1995, that something had just come across his desk that day that he found "shocking" and that the information involved me. I asked him to explain.

18. Mr. Hellwig told me that he did not feel comfortable telling me about it over the telephone, but he would be happy to discuss the matter with me in person.

19. I told Mr. Hellwig that I had plans to see the inmate representative committees at both the Essex County Jail and the Essex County Jail Annex on Friday, December 8, 1996 [*sic*].

20. Mr. Hellwig told me that after I finished meeting with both Inmate Committees, I should come to his office and we would talk again. I again tried to press Mr. Hellwig to tell me what had happened that was causing him concern, but Mr. Hellwig would only tell me that we would talk when we met on Friday.

\* \* \* \* \* \*

22. When I had finished meeting with the Inmate Representatives at the ECJ [on the morning of December 8, 1995], I saw Mr. Hellwig in the ECJ sally port as he was leaving. Mr. Hellwig came over to me and told me that when I went to the ECJA that afternoon, I should make certain that I spoke to Emma Hunter about an incident

that recently happened. He again said that I should come talk with him at his office after I spoke with Ms. Hunter and the other inmate representatives. . . .

23. When Emma Hunter, the Inmate Representative for Satellite 2, arrived at the Inmate Representative Committee meeting on December 8, 1995, she told me that the day before, Sergeant Vitiello from the Internal Affairs Unit at the ECJA confiscated all of her correspondence from me. . . .

24. When I saw Martin Hellwig in his office immediately after the Inmate Representative's meeting, I told him that I was very upset that the jail had confiscated all of my privileged attorney correspondence from my client, Emma Hunter.

25. At that point, Mr. Hellwig told me that he had a copy of the September 29, 1995 letter that I had sent to Ms. Hunter and the other inmate representatives at the ECJA. Mr. Hellwig told me that he had read the letter and that it made reference to an officer staffing memorandum that I had attached to the letter. Mr. Hellwig again asked me if I had ever sent Officer Staffing Schedules to the inmates.

26. I again told Mr. Hellwig that I did not send Officer Staffing Schedules to the inmates, but I had sent them a memorandum I prepared that summarized the officer staffing problems that occurred over a 6 week period of time in the summer. I explained that officer staffing is a legitimate concern of the plaintiffs' [sic] because officer shortages endanger the physical safety of inmates.

27. I told Mr. Hellwig that at the time that I prepared the cover letter and memorandum, I had no idea that the County did not want me to discuss officer staffing problems with my clients. I told Mr. Hellwig that the first time I learned of the County's concern was when we met at the ECJA with the Special Masters, and Ron Manzella [Director of Corrections for the County of Essex] was very upset that I had obtained the officer staffing information and included it in a memo that I had sent the attorneys and the Special Mas-

ters. This meeting at the ECJA occurred on October 6, 1995.

28. I explained to Mr. Hellwig that once I learned of the County's concern, I returned to my office, and asked my secretary to remove the officer staffing memorandum from the package of material that I was sending the inmate representatives. My secretary told me that she had just sent the packages out. The letters were mailed to the inmate representatives either on October 5, 1995 or October 6, 1995.

29. I also told Mr. Hellwig that I decided that I would ask the inmate representatives to return the officer staffing memoranda to me, but the ECJA had started a new practice of insisting that officers sit in on my inmate representative meetings, and I was unable to meet with my clients confidentially to ask them to return the officer staffing memos.

30. I told Mr. Hellwig on December 8, 1995, that now that I know what the County's concerns are, I had no problem accommodating the County's request that I not share officer staffing information with inmates. However, I told Mr. Hellwig that the officer staffing information that I sent to the inmates was not current information, and the inmates know even more about the officer staffing problems that the information reflected in either my memorandum or in the Officer Staffing Schedules themselves.

31. I told Mr. Hellwig that there was absolutely no indication that the information in the officer staffing memorandum had any adverse effect on security at the ECJA.

32. Mr. Hellwig agreed. He told me that there was no indication that the information in the officer staffing memorandum was tied in any way to the recent escapes at the ECJA, and his concern was about the potential for security problems.

33. Mr. Hellwig told me that he actually did not have the officer staffing memorandum that I attached to my September 29, 1995 letter to the Inmate Representatives. However, Mr. Hellwig stated that as long as the information that I put in the officer

staffing memorandum was general in nature, he was sure there was no harm done.

34. I did not make any comment on Mr. Hellwig's characterization of my officer staffing memorandum. At no point did I characterize the scheduling memorandum "as having only the most general information" as Mr. Hellwig now claims. (Hellwig Certification, paras. 5 and 6). This was Mr. Hellwig's characterization, not mine.

35. I have no idea what Mr. Hellwig means when he states that during my meeting with him, I tried to "justify" my false statements of the previous day. (Hellwig Certification, para. 5). I have never made any false statements to Mr. Hellwig.

*Certification of Susan R. Silver,* February 26, 1996 (emphasis in original).

The Special Masters did not hold a hearing, and thus, they did not resolve which version of events was true. This court did hold a hearing on April 17 and 18, 1997 in which Mr. Hellwig and Ms. Silver, among others, testified. At the hearing, Mr. Hellwig testified that he was aware of the difference between "officer staffing schedules" and "officer staffing information":

Q. Now, when, Mr. Hellwig, when you spoke on the telephone with Susan Silver, and I believe the date was December 6th, although in your affidavit or your certification you indicate it was December 7th, whatever the date was, December 6th or 7th, when you spoke with Miss Silver you had in front of you the letter that she had sent, the two page letter that she had sent to the inmate reps. Isn't that correct?

A. That is correct.

Q. And that letter indicated that she had provided the inmate reps with the officer staffing analysis or the officer staffing memorandum. Isn't that correct?

A. Yes.

Q. And she specifically referred to it as an officer staffing memorandum and you knew it as an officer staffing memorandum. Isn't that correct?

A. Yes.

Q. And isn't that—isn't that in your mind, as well as in—well, isn't that in your mind, Mr. Hellwig, distinct from an officer staffing schedule?

A. Yes, it is.

Q. What is the difference?

A. Well, the schedules themselves are— capture a moment in time, an eight hour period, 24 hour period.... The memorandum that was written captured an extended period of time, I believe in excess of 60 days.

*Testimony of Martin Hellwig,* April 17, 1997 at 1.79–80.

Mr. Hellwig's testimony also revealed that he asked specifically about "officer staffing schedules," rather than general staffing information:

Q. But you say that at some point during the conversation you asked her the question did she provide scheduling—schedules to her clients. Is that correct?

A. Yes.

Q. And her answer was what?

A. No, she would not do that.

Q. And that's the truth, isn't it?

\* \* \* \* \* \*

A. As far as I know.

*Id.* at 1.86–87.

It appears that at least one inmate planned a successful escape based on information derived from Ms. Silver's memorandum. Billy Pereira, an inmate at the Jail Annex certified that he escaped form the Jail Annex on October 26, 1995 "after having read a memorandum ... that highlighted the posts that lacked supervision by corrections officers." *Certification of Billy Pereira,* January 19, 1996 at ¶ 1. He described how he obtained and used the information contained in Ms. Silver's memorandum:

On or about October 24, 1995, I was on the telephone in the west wing of the Jail Annex. Lying atop a card table within arm's length were some papers along with a brown folder. I was idly reviewing the papers when I realized that one contained information about corrections officers and their posts at the Jail Annex. It was entitled "Officer Staffing Shortages that Result in the Inadequate Supervision of

Inmates" .... I also saw a Fire Safety Memorandum ... but it was missing the first page. I had both sets of documents in my possession for about five minutes until an inmate trustee took them from me. I learned from the Inadequate Supervision Memorandum that there would be no officer assigned to the gate near Satellite 3.

*Id.* at ¶ 2. Two days later, Mr. Pereira escaped through Satellite 3.

As noted above, the Special Masters issued a report on May 16, 1996, in which they recommended that this court not disqualify Ms. Silver from continued representation of the plaintiffs in this case. That report focused solely on the disclosure of officer staffing information by Ms. Silver. This court held a hearing on April 17 and 18, 1997. At the hearing, Ms. Silver took the stand and repeatedly assured this court that the disclosure of the officer staffing information was a mistake which would not be repeated:

THE WITNESS: ... But Judge, as I said, in that before, I did this one time, October 5th or 6th, 1995. I told the county I would not do it again, I have not and I am now very careful about what information I give to the court, because I have no intention of violating any security policy that Essex County has in either the Essex County Jail or Annex.

*Testimony of Susan R. Silver,* April 17, 1997 at 75–76. Ms. Silver also assured this court that she would *never* disclose other security sensitive information to her clients:

Q. Have you been privy to other information that the county considers of a security nature and which you have treated securely, if you will, and not provided to the inmates?

A. Yes, I have.

Q. Could you describe that?

A. I receive frequently medical information with dates as to when inmates are scheduled to receive surgery in outside hospitals or clinics or outside medical specialists appointments to evaluate their medical problems.

Back in, I believe early 1994, Mr. Del Plato mentioned to me that the county treats that information as being confidential because if inmates knew when they were going to be leaving jail grounds for a medical appointment, that poses a security threat in terms of making an escape easier.

Ever since Mr. Del Plato made that comment to me, I have been very careful to never tell inmates when they're going to be leaving the grounds for a medical appointment or surgery.

*Testimony of Susan R. Silver,* April 18, 1997 at 113.

On May 23, 1997, Quran Johnson, an inmate at the Essex County Jail, was transported to St. Elizabeth Hospital in Elizabeth, New Jersey for medical treatment. Upon arriving at the hospital, Mr. Johnson informed Corrections Officer Charles Green, one of the transporting officers, that he knew of the date and time of his appointment at the hospital through a letter he received from Ms. Silver. That letter, dated May 12, 1997, attached a document entitled, "Request for Medical Attention," which indicated that Mr. Johnson was scheduled for a podiatry examination on May 23, 1997 at 11:00 a.m. A subsequent investigation by jail officials revealed that Mr. Johnson had communicated several times with Ms. Silver concerning his ailments, culminating in the May 12, 1997 letter in which he was informed of the specific date and time of his outside medical appointment.

This court must now determine whether Ms. Silver should be disqualified from this case. In doing so, this court must consider the recommendation of the Special Masters, in light of the subsequent events concerning the disclosure of the date and time of Quran Johnson's outside medical appointment.

## IV. DISCUSSION

Before the Special Masters, the defendants presented four arguments as to why disqualification was appropriate. These contentions were as follows: (1) Ms. Silver improperly obtained the scheduling information through unauthorized *ex parte* communications with Corrections Officer Michael DeMeo, a county employee and the President of the PBA Local at the Jail Annex, in violation of RPC 4.2; (2) Ms. Silver had a non-waivable conflict of interest with her clients, in violation of RPC

1.7(b), on grounds that truthful disclosure of her role in acquiring and disseminating the officer scheduling information would have revealed that she had violated the Public Defender's Code of Ethics and would thereby place her continued employment in jeopardy; (3) Ms. Silver's conduct with respect to the disclosure of the officer scheduling information created an appearance of impropriety, particularly because she is a government attorney; and (4) Ms. Silver knowingly made a false statement of material fact to Mr. Hellwig, in violation of RPC 4.1(a)(1). In addition to the above arguments, the Special Masters perceived that the defendants were also making an implicit argument that Ms. Silver should be disqualified because she exercised extremely bad judgment in divulging the security sensitive information to the inmate representatives and then denying that she had done so when the county investigated the allegation.

Although the defendants have raised numerous issues in support of their motion to disqualify Ms. Silver, this court believes that the core issues in this case concern Ms. Silver's disclosure of security sensitive information to both the inmate representatives and Quran Johnson. This conduct was improper and had the effect of unreasonably increasing the risk of inmate misconduct. That the information was obtained by Ms. Silver within the context of this court's continued oversight of the Essex County jail facilities impugns the integrity of these proceedings. Under these circumstances, Ms. Silver's conduct cannot be written off as just an isolated instance of poor judgment. Rather, these acts manifest an altogether cavalier attitude towards important security concerns at the jail facilities, which impugn the very integrity of these proceedings. Before discussing these core issues, however, this court will address the other arguments raised by

the defendants and previously determined by the Special Masters.

### 1. *Improper Ex Parte Communications with Corrections Officer DeMeo*

Before the Special Masters, the defendants contended that Ms. Silver violated RPC 4.2 by communicating on an *ex parte* basis with Corrections Officer DeMeo. The defendants contended that Corrections Officer DeMeo came within the purview of RPC 4.2 because he was an employee of Essex County, and as such, he had "significant involvement in establishing [Jail] Annex policy regarding staffing ... [since he] is the correction officers' spokesperson regarding staffing issues and, therefore, is involved in staffing decisions." *Defendants' Reply Brf.* at 3–4. The Special Masters rejected this argument, finding that Corrections Officer DeMeo was not a member of the county's "control group" such that RPC 4.2 would be implicated.

While I agree with the Special Masters' conclusion on the narrow issue of whether RPC 4.2 was violated, this is not to say that this court wholeheartedly endorses Ms. Silver's conduct in this regard. Ms. Silver obtained the officer staffing schedules out of the normal discovery process from Corrections Officer DeMeo, who evidently abused his position as the president of the local PBA in gaining unauthorized access to the schedules. Ms. Silver then distilled this raw data into a memorandum detailing specific times and locations of staffing deficiencies, and transmitted this memorandum to inmates at the jail facilities. This conduct on the part of Ms. Silver, on its face, was inappropriate. However, this conduct on the part of Ms. Silver cannot be adequately addressed by reference to RPC 4.2.[5]

RPC 4.2 provides as follows:

conducted this case as if the county was a real party in interest. They found that the defendants have looked to Essex County for the defense of this litigation; the county has used its own funds in defending this litigation and implementing the various requirements provided under the consent orders. The Special Masters therefore considered the county to be a represented party.

The question of whether or not Essex County may be considered a "party" within the ambit of

---

**5.** As an initial matter, it must be pointed out that Essex County, of which Corrections Officer DeMeo is an employee, is not a party to this litigation. The Special Masters, after having recognized this fact, surmised that the county itself was not named in this action to avoid the Eleventh Amendment prohibition of suits against a state and to comply with the mandate of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Special Masters further noted, however, that as a practical matter, the parties have

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter, including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer, or is authorized by law to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented. Reasonable diligence shall include, but not be limited to, a specific inquiry of the person as to whether that person is represented by counsel. Nothing in this rule shall, however, preclude a lawyer from counseling or representing a member or former member of an organization's litigation control group who seeks independent legal advice.

RPC 1.13, in turn, provides in relevant part:

A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents. For the purposes of RPC 4.2 and 4.3, however, the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group. Members of the litigation control group shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter.

RPC 4.2 therefore "restrains a lawyer for one party from speaking directly to another party who is represented by counsel." *In re Opinion 668*, 134 N.J. 294, 297, 633 A.2d 959 (1993). When the party is a corporation or other organization, only certain key employees come within the purview of the rule. RPC 1.13 limits the applicability of RPC 4.2 to employees who are "responsible for, or significantly involved in, the determination of the organization's legal position in the matter." *See also Apple Corps Ltd. v. International Collectors Soc'y*, 1998 WL 345078 at *18–*19 (D.N.J. June 26, 1998). Accordingly, RPC 4.2 is violated, with respect to current employees of a party, if: (1) the employee is within the "litigation control group" as defined by RPC 1.13; or (2) the employee is otherwise represented by counsel. *See Michaels v. Woodland*, 988 F.Supp. 468, 472 (D.N.J.1997).

Corrections Officer DeMeo is not a member of Essex County's "litigation control group." Clearly, he was neither responsible for nor significantly involved in the determination of Essex County's legal position in the matter. *See* RPC 1.13. At best, Corrections Officer DeMeo provided "factual information or data," which is insufficient to support a finding that an employee is a member of the "litigation control group." With respect to the second prong above, there is no indication that Corrections Officer DeMeo, at the time of his contact with Ms. Silver, was represented by other counsel.

The defendants argued that Corrections Officer DeMeo should be considered part of the "litigation control group" because he had "significant involvement in establishing [Jail] Annex policy regarding staffing ... [since he] is the correction officers' spokesperson regarding staffing issues and, therefore, is

RPC 4.2 is not, as intimated by the Special Masters, entirely clear. There is case law which suggests that, at least in the criminal context, formal proceedings must first be initiated against a party for RPC 4.2 to be implicated. *See, e.g., United States v. Balter*, 91 F.3d 427, 436 (3d Cir.) (citing *State v. CIBA–GEIGY Corp.*, 247 N.J.Super. 314, 320, 589 A.2d 180 (App.Div. 1991), *appeal dismissed*, 130 N.J. 585, 617 A.2d 1213 (1992)), *cert. denied*, —— U.S. ——, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996). The Comment to RPC 4.2, however, states that the rule

"also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question." Accordingly, whether Essex County can be considered a "party" under RPC 4.2 in this case is a close question. Because this court concludes, in agreement with the Special Masters' finding, that Corrections Officer DeMeo was not sufficiently identified with Essex County, even if the county could be considered a "party," resolution of this particular issue is rendered unnecessary.

involved in staffing decisions." *Defendants' Reply Brf.* at 3–4. Even if his involvement in developing policies concerning staffing could be equated with significant involvement in the determination of Essex County's legal position—which I doubt—Corrections Officer DeMeo clearly undertook this responsibility in his capacity as the president of the PBA Local, not as an employee of the county. As the Special Masters correctly found:

> When he is engaged in this activity ... he is not representing the County or acting on the County's behalf. To the contrary, he is representing a completely separate entity, the PBA, and is acting on the PBA's behalf to advocate for the Corrections Officers that it represents. He sits across the table from the County and does his best to convince the County to agree to the PBA's views of the matter. This hardly makes him a member of the County's "control group." To the contrary, his involvement in decision-making as PBA President establishes his identity as separate and apart from the County. The PBA does not control the County, it simply negotiates with it. It may sometimes, or even often, convince the County to accept its point of view, but it is always separate and apart from the County in terms of its party status.

*Report and Recommendation* at 8.

Because Corrections Officer DeMeo was not a member of the "litigation control group," Ms. Silver's *ex parte* contact with him in obtaining the staffing information did not violate RPC 4.2.

### 2. *Conflict of Interest*

The defendants also contended that Ms. Silver's actions gave rise to a disqualifying conflict of interest pursuant to RPC 1.7(b). Specifically, the defendants contended that Ms. Silver had a conflict of interest with her clients because her alleged misconduct in acquiring and distributing the scheduling information violated the regulations of the Public Defenders Office, and thus, could have lead to her dismissal if the truth were known. The defendants articulated this portion of their motion as follows:

> [I]t is in Ms. Silver's interest to suppress all information concerning her acquisition of the custodial officers staffing schedules because she acquired the schedules in an unethical manner. Her unethical conduct is grounds for dismissal from her position pursuant to the Public Defender's Code of Ethics. Already by failing to timely disclose that she sent scheduling information to inmates, Ms. Silver has increased the danger faced by her clients. Her continued lack of cooperation in the County's investigation into the breach of security also offends her clients' interests because one of the purposes of the investigation is to prevent a recurrence of the breach.

*Defendants' Reply Brf.* at 12–13.

RPC 1.7(b), the specific provision at issue here, provides as follows:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

As noted above, the conflict here is between Ms. Silver's own interests in keeping her job as a public defender and the interests of her clients in having a safe prison environment.

As an initial matter, the plaintiffs contend that the defendants do not have standing to raise the question of a conflict of interest because it is the plaintiffs themselves, not the defendants, who have suffered from the alleged conflict. The plaintiffs rely specifically on *Hovsons, Inc. v. Secretary of Interior,* 711 F.2d 1208, 1213 (3d Cir.1983). The plaintiffs have misread *Hovsons.* In that case, the plaintiffs, owners and users of property located in the Pinelands area of New Jersey, sued the Secretary of the Inte-

rior alleging that they were aggrieved by the Secretary's approval of the "Comprehensive Management Plan" ("CMP") for the Pinelands area. *Id.* at 1210. During the course of the litigation, the Secretary moved to disqualify the plaintiffs' counsel, contending that he was representing conflicting interests. *Id.* at 1211. In determining that disqualification was not appropriate, the Third Circuit made the following remarks, which the plaintiffs herein have evidently construed as supporting their proposition that a party in litigation has no standing to raise conflicts of interest issues concerning his adversary:

> Second, we share the district court's concern about "the questionable nature of plaintiffs' standing to raise objection to the Secretary of the Interior's consideration of the national defense mission...." Even assuming that a private plaintiff *could* suffer some "distinct and palpable injury to himself," ... because of the Secretary's failure to consider whether the CMP adequately provided for the national defense mission, none of the allegations made by *these* plaintiffs in *this* case suggests such injury. Thus, with respect to this single, narrow, alleged violation of the statute, the plaintiffs have raised only a "generalized grievance shared in substantially equal measure by all or a large class of citizens." ... In our view, they have not demonstrated their standing to object to the Secretary's alleged failure to fulfill his statutory duty.

*Id.* at 1213 (citations omitted) (emphasis in original).

This passage, as well as the *Hovsons* case as a whole, has nothing at all to do with an adversary's standing to raise conflicts of interest issues. Rather, this particular section of the *Hovsons* case concerned the *plaintiffs'* standing to contest the Secretary's consideration of the "national defense mission" under the relevant statutory scheme, not the *Secretary's* standing to raise a potential conflict of interest between the plaintiffs and their counsel. *See id.* ("The reason that we have addressed the plaintiffs' standing is that their absence of standing is an important factor in assessing the interests at stake in our consideration of the Secretary's motion to disqualify."). Moreover, the plaintiffs' position on

this issue is directly contradicted by *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 1994 WL 62124 (D.N.J. Feb.23, 1994). In that case, Judge Wolin of this district rejected the same argument now forwarded by the plaintiffs. *See id.* at *2. Accordingly, the plaintiffs' contention that the defendants are without standing to raise a potential conflict of interest between her and her clients must be rejected.

Turning to the substantive issue at hand, this court is in agreement with the Special Masters' conclusion that the defendants have failed to prove that a conflict of interest requires Ms. Silver's disqualification. This case, as will be discussed, concerns reckless misconduct on the part of Ms. Silver. Her misconduct, however, cannot be squarely addressed by the conflict of interest rules. In determining this issue, it is important to recognize that cases involving a lawyer's self interest are viewed, in an analytical sense, somewhat differently than cases involving dual representation. *Cf. Beets v. Scott*, 65 F.3d 1258, 1265–66 (5th Cir.1995) ("[T]he demands and reasoning of legal ethics militate against treating multiple representation cases like those in which the lawyer's self-interest is pitted against the duty of loyalty to his client."); *Garcia v. Bunnell*, 33 F.3d 1193, 1198 n. 4 (9th Cir.1994) ("It is not logically necessary that the approach of these [multiple representation] cases also apply to conflicts between a defendant's and the attorney's own interests."). This is due in part to the fact that multiple representation cases, in general, present relatively discrete fact patterns, arising only with respect to multiple or former representation. *See Beets*, 65 F.3d at 1270 (noting that multiple representation cases present "unique, straightforward danger[s] of conflict...").

By contrast, self-interest cases "fall along a wide spectrum of ethical sensitivity from merely potential danger to outright criminal misdeeds." *Id.* In short, a lawyer's self-interest is, in theory, inherent in every case in which he participates, and the "range of possible breaches ... is virtually limitless." *Id.* at 1271. One need not tax the mind too strenuously to conjure up an entire assortment of instances in which an attorney's self-

interest may theoretically conflict with the interests of his client. Indeed, a private practice attorney's interest in extending litigation to obtain greater fees is surely at odds with a client's interest in a swift and relatively inexpensive resolution of his case, to give just one example. *See also id.* (providing other illustrations of instances where attorney's self-interest is arguably implicated). The vast majority of these instances, however, do not present the sort of conflict of interest recognized by the law. *Id.* ("The 'conflict' between the lawyer's self-interest and that of his client is not a real conflict in the eyes of the law.").

■ Because of the virtually limitless cases in which a "conflict" may theoretically arise when a lawyer's self-interest is implicated, there is a very real danger of analyzing these issues not on fact but on speculation and conjecture. Accordingly, when a conflict of interest issue arises based on a lawyer's self-interest, a sturdier factual predicate must be evident than when a case concerns multiple representation. Only by requiring a more specific articulation of the facts giving rise to a conflict situation can courts refrain from effectively "straightjacket[ing] counsel in a stifling, redundant federal code of professional conduct." *Id.* at 1272. Supposition and speculation, therefore, will simply not do.

■ Turning to the case at hand, the defendants' argument is premised on the notion that Ms. Silver acted unethically in obtaining the officer staffing schedules. But as noted above, and as found by the Special Masters, Ms. Silver did not squarely violate RPC 4.2 in her contacts with Corrections Officer DeMeo. Furthermore, the defendants have not adequately shown that Ms. Silver's acquisition of the officer staffing schedules from Corrections Officer DeMeo violated any specific ethics provision.

The defendants have argued that Ms. Silver's interest in this matter was to keep her job, as the disclosure of her conduct would have jeopardized continued employment as a public defender. This fear of losing her job is far too speculative to support a finding of a conflict of interest. While not entirely on point with the facts of this case, *United*

*States v. Horton,* 845 F.2d 1414 (7th Cir. 1988), is instructive. In that case, the defendant argued that he was provided ineffective assistance of counsel because his attorney had a conflict of interest arising from his becoming a candidate for the United States Attorney position. In rejecting the defendant's claim, the court found no conflict of interest:

> [T]his case presents at most a remote possibility of a conflict of the type with which *Cuyler* was concerned. ... Though it is conceivable that an unprincipled defense attorney in line for a job as United States Attorney might encourage a defendant in some circumstances to plead guilty in order for counsel to curry favor with his or her future employer, that is too fanciful upon which to base a *per se* rule of conflict.

*Id.* at 1419–20. The Seventh Circuit contrasted the facts of *Horton* with those of *United States v. Ellison,* 798 F.2d 1102, 1106 (7th Cir.1986), in which a conflict of interest arose where defense counsel explicitly advised the defendant to plead guilty to avoid "making waves" with federal prosecutors with whom counsel would be working in the future. In *Horton,* however, no evidence was presented to substantiate the defendant's claim that his counsel's advice to him to plead guilty was motivated by his desire to become a United States Attorney. 845 F.2d at 1420. There was simply no "active representation of conflicting interests" on the part of defendant's counsel. *Id.* at 1419; *see also United States v. Salerno,* 868 F.2d 524, 540–41 (2d Cir.1989) (finding no actual conflict of interest where defense attorney was being investigated by government and was allegedly unusually cooperative with government in defendant's case); *United States v. Andrews,* 790 F.2d 803, 810–11 (10th Cir.1986) (finding no conflict of interest when court refused to allow attorney to withdraw from representation to attend premedical studies at college)

Similarly, there appears to be no "active representation of conflicting interests" in this case. While the defendants have argued that Ms. Silver's conduct put her job in jeopardy, there are no facts to support this proposition. As noted by the Special Masters, the opposite seems to be true:

The Public Defender's Office has fully supported Ms. Silver in opposing this motion. It has provided her with counsel to defend this motion. It has not removed her from this matter or taken any other disciplinary action against her based upon its receipt and review of all of the affidavits and arguments contained in the County's motion. Most importantly, in its brief in opposition to this disqualification motion, the Public Defender unequivocally states: "the Office of the Public Defender has no grounds, and no intention to, remove or discipline Ms. Silver." . . . In view of this unequivocal statement, there is no reason to believe that Ms. Silver has any reasonable fear of discharge that would give rise to a conflict of interest between her clients and herself.

*Report and Recommendation* at 26. This court concludes that Ms. Silver's interest in keeping her job is far too tenuous and speculative to justify a finding of a disqualifying conflict of interest.

### 3. *Appearance of Impropriety*

The defendants have also argued that even if there was no actual conflict of interest, Ms. Silver's conduct created an appearance of impropriety. The substance of the argument on this point, as presented to the Special Masters, was brief:

> There can be no dispute that Ms. Silver's unethical conduct has tainted her representation of the plaintiff inmates. Her actions evince not merely ignorance but deliberate suppression of information material to her clients' safety. At the very least, Ms. Silver's continued representation creates an appearance of impropriety. Accordingly, she should be disqualified.

*Defendant's Moving Brf.* at 14. The appearance of impropriety is all the more significant in this case, the defendants argue, since Ms. Silver is a government attorney "invested with the public trust." In opposition to this facet of the defendants' motion, the plaintiffs have argued that the appearance of impropriety doctrine applies only to multiple misrepresentation cases, which is obviously not the case here.

The Special Masters rejected the defendants' contentions on this point and found that there was no appearance of impropriety. In doing so, however, they implicitly accepted the defendants' underlying assumption that the appearance of impropriety doctrine was not limited to multiple representation cases, as was argued by the plaintiffs. Rather, the Special Masters' conclusion that no appearance of impropriety existed in this case was based on their view that Ms. Silver's conduct was not necessarily improper:

> Setting aside her interviews with Mr. Hellwig, what Ms. Silver stands "accused" of doing is conducting a vigorous investigation of facts relevant to this litigation and of sharing the information that she found with her clients. But for the fact that her clients are inmates in a correctional institution, no one would think to criticize her for such conduct. To the contrary, such conduct is generally considered to be in full accord with an attorney's duties. . . . If Ms. Silver erred in sending the scheduling information to her clients, we believe that she did so innocently, with no intention other than to provide proper representation to her clients.

*Report and Recommendation* at 29, 31.

As will be discussed more fully later in this opinion, this court must diverge from the Special Masters' reasoning in this regard. I do not concur in the underlying assumption of their analysis that the disclosure of this security sensitive information was simply an innocent oversight on the part of Ms. Silver. This court views Ms. Silver's conduct as a clear and obvious breach of security. It was akin to providing the inmates with the keys to their cells. However, I do concur in the Special Masters' ultimate conclusion that the appearance of impropriety rules do not apply to this factual scenario.

█ As an initial matter, this court must reject the plaintiffs' argument that the appearance of impropriety standard applies only to multiple representation cases. As pointed out by the plaintiffs, the phrase "appearance of impropriety" is explicitly used in RPC 1.7(c)(2), which is part of the general conflict of interest rule. RPC 1.7(c) provides as follows:

[RPC 1.7] shall not alter the effect of case law or ethics opinions to the effect that:

(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

(2) in certain cases or situations creating an *appearance of impropriety* rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the *multiple representation* poses substantial risk of disservice to either the public interest or the interest of one of the clients. (Emphasis supplied).

While the plaintiffs acknowledge that the appearance doctrine is incorporated by reference in RPC 1.9, they maintain that the doctrine's applicability is limited only to multiple representation cases.

The plaintiffs have taken an overly restrictive view of the applicability of the appearance of impropriety doctrine. It is not, as they have argued, limited only to multiple representation cases. For example, the doctrine is "indirectly" found in RPC 1.13(e), concerning an attorney's representation of an organization. *See In re Opinion No. 569,* 103 N.J. 325, 330 n. 4, 511 A.2d 119 (1986). In addition, the doctrine is incorporated by reference in RPC 3.7(b), which concerns the issue of an attorney acting as a witness. *See id.* While this court does not doubt the plaintiffs' contention that much of the case law concerning the appearance doctrine involves multiple representation, the doctrine is not necessarily limited to those particular factual scenarios. *See, e.g., In re Tenure Hearing,* 103 N.J. 548, 511 A.2d 1171 (1986) (involving issue of whether attorney who previously served as administrative law judge in Office of Administrative Law and had presided in case involving particular parties should be disqualified from representing as private attorney one of those parties in another but different contested case before Office of Administrative Law).

■ That being said, the applicability of the appearance of impropriety doctrine is also not quite as broad as the defendants implicitly suggest. It does not apply to conduct which may simply be improper or inappropriate. Indeed, if the doctrine were so broadly applied, all other ethical provisions would be entirely superfluous. Rather, while the doctrine is not limited to multiple representation cases, it is evident that it applies mainly to those cases in which the loyalty of the attorney to his client is at stake or where there is not an actual conflict of interest but the policies underpinning the conflict of interest rules are implicated. That is why, for instance, the appearance doctrine applies not only to multiple representation cases—which are the clearest example of where an attorney's loyalty to his client may be compromised—but also to cases in which the attorney may act as a witness. *See* RPC 3.7. Clearly, the appearance of impropriety is applicable to those cases in which an attorney's duty of loyal representation to his client may be unduly influenced by extraneous factors. In addition, the appearance doctrine may apply to disqualify an attorney, for example, who hired his adversary's former expert witness after the adversary had divulged confidential information to that expert. *Cordy v. Sherwin–Williams Co.,* 156 F.R.D. 575 (D.N.J.1994). *Cordy* presented a situation where there was no actual conflict of interest, but the danger of the side-switching expert witness divulging confidential information implicated the underlying rationale of the conflict of interest rules.

■ Under the circumstances of this case, a determination as to whether Ms. Silver's conduct gave rise to an appearance of impropriety focuses not on the appropriateness of her conduct in and of itself, but on whether her conduct in any way compromised her duty of loyalty to her clients. The defendants' argument then appears to be an offshoot of their argument concerning an actual conflict of interest, discussed above. That is, the defendants' contention seems to be that an appearance of impropriety arose in this case because Ms. Silver's alleged misconduct in acquiring and distributing the scheduling information violated the regulations of the Public Defenders Office, and thus, could lead to her dismissal if the truth were revealed.

While the appearance doctrine applies where no actual conflict exists, the New Jersey Supreme Court has advised that there " 'must be something more than a fanciful possibility,' " and there must be " 'a reasonable basis.' " *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 216, 536 A.2d 243 (1988) (quoting *Higgins v. Advisory Comm. on Prof'l Ethics*, 73 N.J. 123, 129, 373 A.2d 372 (1977)). This court concludes that Ms. Silver's interest in keeping her job is far too tenuous and speculative to support a finding of an appearance of impropriety. There is simply no evidence, apart from the defendants' allegations, that Ms. Silver's employment was ever in jeopardy and that her conduct in this matter was in some measure dictated by this personal interest. Accordingly, this court finds that there was no appearance of impropriety in this case.

### 4. *False Statement of Material Fact or Law*

The defendants have also sought disqualification based on Ms. Silver's alleged breach of RPC 4.1(a)(1) arising from her conversations with Mr. Hellwig on December 6 and 8, 1995. Specifically, the defendants contended that Ms. Silver lied to Mr. Hellwig concerning her dissemination of officer staffing information to the inmate representatives at the Jail Annex. Ms. Silver has argued that she made no misrepresentation to Mr. Hellwig, and even if she did, she owed no duty to Mr. Hellwig and thus could not have misled him in violation of RPC 4.1(a)(1).

The Special Masters rejected the plaintiffs' contentions and found that the facts supported the conclusion that she had violated RPC 4.1(a)(1).[6] As the issue was correctly framed by the Special Masters, the question here is whether Ms. Silver was sufficiently forthcoming in her discussions with Mr. Hellwig on the topic of her dissemination of officer staffing information. Although I agree that Ms. Silver was not sufficiently candid and forthcoming in her discussions with Mr. Hellwig, based upon my review of the entire record in this case and in particular the testimony of Mr. Hellwig at the April 17, 1997 hearing, this court finds that Ms. Silver did not technically violate RPC 4.1(a)(1).

RPC 4.1(a)(1) provides that "[i]n representing a client a lawyer shall not knowingly … make a false statement of material fact or law to a third person." As noted by the Special Masters, RPC 4.1 requires scrupulous honesty, particularly in dealing with adversaries and the court.

As noted above, Mr. Hellwig and Ms. Silver offered slightly different versions of what transpired on December 6 and 8, 1995. In determining that Ms. Silver was not sufficiently forthcoming in her conversa-

**6.** The Special Masters came to a similar conclusion with respect to RPC 8.4(c), which states in relevant part:

> It is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

It is apparent that the Special Masters relied specifically on the "misrepresentation" aspect of this rule. Notably, the defendants originally did not argue that RPC 8.4(c) applied to this case. This court is not at all certain whether RPC 8.4(c) can be equated with RPC 4.1(a)(1), as the Special Masters have seemingly done. In *Apple Corps Ltd. v. International Collectors Society*, 1998 WL 345078 (D.N.J. June 26, 1998), Judge Greenaway of this district noted that the "literal application of the prohibition of RPC 8.4(c) to any 'misrepresentation' by a lawyer, regardless of its materiality, is not a supportable construction of the rule." *Id.* at *20. Judge Greenaway reasoned that to apply RPC 8.4(c) to those situations involving false statements would in turn render RPC 4.1 entirely superfluous. *Id.* This court agrees with Judge Greenaway's reasoning

in this regard. RPC 8.4(c) is generally limited to those cases involving fraud or deceit, or put another way, to " 'misrepresentations that manifest a degree of wrongdoing….' " *Id.* at *21 (quoting David B. Isbell & Lucantonia N. Salvi, *Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers; An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct*, 8 Geo. J. Legal Ethics 791, 817 (1995)). Accordingly, RPC 8.4(c) has been applied to cases involving, for instance, misappropriation of client trust funds, *see, e.g., In re Pomerantz*, 1998 WL 396943 (N.J. July 17, 1998), or the fraudulent misappropriation of law firm funds for personal use, *see, e.g., In re Greenberg*, 1998 WL 396557 (N.J. July 17, 1998).

The Special Masters did not determine whether Ms. Silver's conduct rose to the level of fraud or deceit within the ambit of RPC 8.4(c). Because of this court's determination that RPC 4.1(a)(1) was not violated by Ms. Silver, I do not believe it necessary to determine whether RPC 8.4(c) was also violated.

tions with Mr. Hellwig, the Special Masters rejected the plaintiffs' contention that there was a distinction between "officer staffing schedules" and "officer staffing information":

We are also troubled by the undue precision of her certification in response to the motion. For example, although she admits that Mr. Hellwig asked her about officer staffing information to the inmates, she consistently stresses that he asked whether she had sent "Officer Staffing Schedules" to the inmates and did not use some more general term. She always capitalizes the phrase as though it were a proper noun, necessarily limited in its application to specific group of documents. We do not generally view the phrase "officer staffing schedules" as a proper noun. Given the semiotic difficulties of daily communication, we cannot imagine how she knew, or could possibly have known, that Mr. Hellwig was using the phrase with such precision. More likely, whatever the exact phrase employed, Mr. Hellwig was asking about whether she sent detailed information regarding officer staffing schedules to the inmates.

*Report and Recommendation* at 18–19. Mr. Hellwig, however, was aware of the difference between "officer staffing schedules" and "officer staffing information," although it is also clear that he may not have intended to make such a distinction when he queried Ms. Silver:

Q. Now, when, Mr. Hellwig, when you spoke on the telephone with Susan Silver, and I believe the date was December 6th, although in your affidavit or your certification you indicate it was December 7th, whatever the date was, December 6th or 7th, when you spoke with Miss Silver you had in front of you the letter that she had sent, the two page letter that she had sent to the inmate reps. Isn't that correct?

A. That is correct.

Q. And that letter indicated that she had provided the inmate reps with the officer staffing analysis or the officer staffing memorandum. Isn't that correct?

A. Yes.

Q. And she specifically referred to it as an officer staffing memorandum and you

knew it as an officer staffing memorandum. Isn't that correct?

A. Yes.

Q. And isn't that—isn't that in your mind, as well as in—well, isn't that in your mind, Mr. Hellwig, distinct from an officer staffing schedule?

A. Yes, it is.

Q. What is the difference?

A. Well, the schedules themselves are—capture a moment in time, an eight hour period, 24 hour period.... The memorandum that was written captured an extended period of time, I believe in excess of 60 days.

\* \* \* \* \* \*

Q. And Susan Silver's memorandum was nothing like that, was it?

A. No, it was not.

Q. It was a very different thing than a daily officer staffing schedule. Is that right?

A. Yes.

*Testimony of Martin Hellwig,* April 17, 1997 at 1.79–80; 1.83.

Mr. Hellwig's testimony also revealed that he asked specifically about "officer staffing schedules," rather than general staffing information, and that Ms. Silver's response was, technically speaking, not untrue:

Q. But you say that at some point during the conversation you asked her the question did she provide scheduling—schedules to her clients. Is that correct?

A. Yes.

Q. And her answer was what?

A. No, she would not do that.

Q. And that's the truth, isn't it?

\* \* \* \* \* \*

A. As far as I know.

*Id.* at 1.86–87.

 The Special Masters also found that Ms. Silver misled Mr. Hellwig by remaining silent when he made certain statements concerning the general nature of the information contained in her memorandum. The Special Masters focused specifically on the following

statements made by Ms. Silver in her certification:

> 33. Mr. Hellwig told me that he actually did not have the officer staffing memorandum that I attached to my September 29, 1995 letter to the Inmate Representatives. However, Mr. Hellwig stated that as long as the information that I put in the officer staffing memorandum was general in nature, he was sure there was no harm done.
>
> 34. I did not make any comment on Mr. Hellwig's characterization of my officer staffing memorandum. At no point did I characterize the scheduling memorandum "as having only the most general information" as Mr. Hellwig now claims. (Hellwig Certification, paras. 5 and 6). This was Mr. Hellwig's characterization, not mine. (Emphasis in original).

The Special Masters concluded that, under the circumstances, it was incumbent upon Ms. Silver to correct Mr. Hellwig's assumption concerning the "general nature" of the memorandum she had provided to the inmates:

> We believe Ms. Silver is attempting to draw too fine a line as to her ethical responsibilities. . . . It is not enough that every word spoken may have been truthful. One can misrepresent and mislead by silence as well as by speech. *See, e.g., Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521 (1981). Ms. Silver certainly knew what she had sent to the inmates, that Mr. Hellwig and the County considered the question of what she had sent to be an important one and that she was leaving Mr. Hellwig with a misunderstanding as to the nature of what she had sent.

*Report and Recommendation* at 18.

While I agree that silence can have the effect of misleading just as an affirmative representation, I do not believe that Mr. Hellwig could reasonably have been misled in this case. The memorandum in question was already in the hands of defendants' counsel since it was addressed to them. Moreover, while Mr. Hellwig did not have a copy of the memorandum in front of him during the telephone conversation with Ms. Silver, he testified that he had reviewed the memorandum previously:

> Q. Just to clarify, Mr. Hellwig, while you were conversing on the phone with Miss Silver, you had in front of you a copy of the cover letter but not a copy of the memorandum?
>
> A. That's correct.
>
> Q. But you had seen the memorandum several weeks earlier and you knew what the contents of the memorandum were?
>
> A. That is also correct.
>
> Q. The contents of the memorandum were not the equivalent of an officers staffing schedule?
>
> A. That's correct.

*Testimony of Martin Hellwig*, April 17, 1997 at 1.85. Mr. Hellwig had already reviewed Ms. Silver's memorandum, and thus, he was in a position to know whether it contained general information, as he had characterized it, or specific details of staffing deficiencies.

■■■ While this court finds that Ms. Silver did not technically violate RPC 4.1(a)(1), I concur with the Special Masters' overall assessment that Ms. Silver played far too close to the line of reasonable conduct. As the New Jersey Supreme Court has recognized:

> It has been noted that "the Code of Professional Responsibility is not designed for Holmes' proverbial 'bad man' who wants to know just how many corners he may cut, how close to the line he may play, without running into trouble with the law." *General Motors Corp. v. City of New York*, 501 F.2d 639, 649 (2d Cir.1974) (quoting O.W. Holmes, *The Path of the Law*, in *Collected Legal Papers* 170 (1920)). Rather, "it is drawn for the 'good man' as a beacon to assist him in navigating an ethical course through the sometimes murky waters of professional conduct." *Id.*

*Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469, 416 A.2d 852 (1980). In this light, I am extremely troubled by Ms. Silver's less than candid statements and non-statements to Mr. Hellwig. Rather than acknowledging that she had provided officer staffing information to prison inmates, she, for reasons which escape this court, was not forthcoming and at

times disingenuous. For instance, Ms. Silver stated in her certification: "I also told Mr. Hellwig that I never would send Officer Staffing Schedules to the inmates." While she may not have sent the inmates the actual schedules themselves, she did send a detailed summary of the schedules. This summary, which provided specific information concerning staffing shortages, was far more useful that the actual schedules themselves. By stating that she would never send "Officer Staffing Schedules," Ms. Silver created the impression that she recognized the dangers in providing that *type* of information. That is the only reasonable interpretation of that statement within this context.[7]

Under the facts presented to this court, however, I am constrained to find that Ms. Silver's statements made to Mr. Hellwig did not rise to the level of willful dishonesty contemplated by RPC 4.1.

## 5. *Disqualification*

 Although this court finds that Ms. Silver did not technically violate a specific RPC provision, disqualification is nevertheless required as security breaches of this sort simply cannot be countenanced. Ms. Silver, as the inmates principal attorney in this case, certainly had a duty to zealously represent her clients. Having reviewed the record as whole, however, this court gained the distinct impression that at some point during this litigation, Ms. Silver's representation of the inmates became something more than mere zealous advocacy. In this transformation, Ms. Silver lost the perspective of an advocate, one whose duties run not only to clients but also to the court and the public. The dual responsibilities of an advocate are starkly implicated in this case, which involves inmates and the conditions of their confinement. As their attorney, Ms. Silver had a duty to zealously represent their interests; yet at the same time, she had a countervailing duty to the court and to the public to ensure that that representation did not increase the risk of security breaches at the jail facilities. Admittedly, the line between zealous advocacy and a breach of security,

---

**7.** I am also troubled by the plaintiffs' contention that Ms. Silver was not obligated to be fully candid with Mr. Hellwig because she owed no duty to him. Relying on *Petrillo v. Bachenberg*, 139 N.J. 472, 655 A.2d 1354 (1995), the plaintiffs maintain that an attorney violates RPC 4.1 only when he or she has a pre-existing duty to that third party. The plaintiffs further contend that under *Petrillo*, not only must a pre-existing duty be shown, but also that the defendants relied to their detriment on the allegedly misleading information. No such duty exists in this case, the plaintiffs contend, as Ms. Silver "owed no duty to Mr. Hellwig, rather she owed a duty to her (highly unpopular) clients to represent them vigorously." *Plaintiffs' Opp. Brf*, at 15. The plaintiffs misconceive the duty of honesty required under RPC 4.1, and in so doing, misconstrue *Petrillo*.

*Petrillo* specifically concerned the scope of an attorney's duty to a third party non-client for purposes of determining whether a malpractice action may lie. In finding that such a duty exists under specified circumstances, the New Jersey Supreme Court stated:

> Whether an attorney owes a duty to a non-client third party depends on balancing the attorney's duty to represent clients vigorously, Rules of Professional Conduct, Rule 1.3 (1993), with the duty not to provide misleading information on which third parties foreseeably will rely, Rules of Professional Conduct, Rule 4.1 (1993).

*Petrillo*, 139 N.J. at 479, 655 A.2d 1354. This statement, properly construed, stands for the general proposition that in determining whether a duty to a third party exists at all, the duty not to provide misleading information is a relevant consideration and must be measured against the attorney's duty to represent his clients vigorously. To conclude from this that a violation of RPC 4.1 requires a pre-existing duty tortures the holding and analysis of *Petrillo*. Nowhere in *Petrillo* does it state or even imply that a pre-existing duty is necessary before a violation of RPC 4.1 may be found. Contrary to the plaintiffs' contention that *Petrillo* "addressed the scope of RPC 4.1," *Plaintiffs' Opp. Brf.* at 15–16, the case did no such thing.

In stating that Ms. Silver owed no duty to Mr. Hellwig, and thus, owed no duty to be fully candid with him, the plaintiffs ignore the plain fact that Ms. Silver's duty under RPC 4.1, in large measure, is not inextricably intertwined with her duty to her clients. Her duty to represent her clients zealously in no way diminishes her duty to refrain from making false statements or misleading third parties. RPC 4.1 stands alone, providing a clear, unambiguous rule concerning a lawyer's ethical duty to speak truthfully. It does not permit a lawyer to be less than truthful simply because there may not be some sort of "fiduciary duty" running to a third party for purposes of determining whether a tort cause of action may lie. The "duty" is provided within the four corners of RPC 4.1 itself, and reference need not be made to any other pre-existing duty.

under the circumstances of this case, may be quite difficult to distinguish at times. This is not one of those times. That one should not provide inmates with detailed information concerning specific staffing deficiencies is derived not from any subtlety of law, but from common sense. Breaching security again, after assuring the court otherwise, is sheer recklessness.

 Although many of the reported decisions concerning disqualification of attorneys concern conflicts of interest, other forms of attorney misconduct may also justify disqualification. *See, e.g., Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080 (S.D.N.Y.1989) (holding disqualification of defendant's attorney warranted after private conversation between him and plaintiff in which he disparaged plaintiff's counsel). Indeed, disqualification of an attorney need not be predicated upon a finding that a specific RPC rule has been violated. *See United States v. Voigt*, 89 F.3d 1050, 1076 n. 12 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *Cordy*, 156 F.R.D. at 583. As the Third Circuit explained:

> The "fair and proper administration of justice" side of the equation merely "include[s] the interests underlying the ethical standards governing the practice of law . . . ;" it is neither defined nor circumscribed by those standards. On the contrary, a district court has independent interests in protecting its judgments against later collateral attack, preserving the integrity of its proceedings, and protecting the truth-seeking function of the proceedings.

*Voigt*, 89 F.3d at 1076 n. 12 (citations omitted); *see also Inorganic Coatings, Inc. v. Falberg*, 926 F.Supp. 517, 519 (E.D.Pa.1995) ("Courts have vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar, eliminating conflicts of interest, and protecting confidential communications between attorneys and their clients. To protect these vital interests, courts have the power to disqualify an attorney from representing a particular client.").

 The power to disqualify an attorney from a particular action emanates from the "inherent powers of any federal court [over the] admission and discipline of attorneys practicing before it." *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984); *see also Fineman v. Armstrong World Indus., Inc.*, 1993 WL 414752 at *5 (D.N.J. July 30, 1993) ("Inherent in this Court's power to manage the cases on its docket is the power to impose sanctions where an attorney's misbehavior is prejudicial to an adversary . . . or threatens the orderly administration of justice . . . ."); *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir.1985) ("A trial judge possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt."); *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980) (noting that "district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it"). Thus, while as a general matter courts "exist to resolve disputes, and not to discipline lawyers who come before them," district courts have a " 'duty to supervise members of its bar.' " *Papanicolaou*, 720 F.Supp. at 1082–83 (quoting *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 131 (2d Cir.1976)); *see also Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir.1984); *Meat Price Investigators Ass'n v. Spencer Foods, Inc.*, 572 F.2d 163, 165 (8th Cir.1978). The exercise of this inherent authority in determining whether an attorney should be disqualified is committed to the sound discretion of this court. *See Miller*, 624 F.2d at 1201; *Fineman*, 1993 WL 414752 at *5.

 As another member of this court has recognized, "motions to disqualify are generally viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.' " *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993) (quoting *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983)). Thus, although doubts are to be resolved in favor of disqualification, a party seeking disqualification has a " 'heavy burden' " and

must satisfy a "'high standard of proof.'" *Id.* (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983)). Stated simply, "when deciding on a motion for disqualification, a court should proceed with caution." *Moss v. TACC Int'l Corp.*, 776 F.Supp. 622, 624 (D.Mass.1991).

Numerous courts that have addressed the issue of disqualification of attorneys seem to agree that disqualification is justified when an attorney's continued participation will taint the proceedings. *See Fineman*, 1993 WL 414752 at *6 ("The focal point of this Court's decision must be the entry of an order calculated to insure, as much as possible, the orderly, appropriate and focused conduct of this litigation during ensuing trial and pretrial proceedings."). As a general matter, "a district judge should disqualify the offending counsel when the integrity of the adversarial process is at stake." *Papanicolaou*, 720 F.Supp. at 1083. As noted by the Second Circuit, the "business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976); *see also World Youth Day, Inc. v. Famous Artists Merchandising Exch., Inc.*, 866 F.Supp. 1297, 1303 (D.Colo.1994); *Parkinson v. Phonex Corp.*, 857 F.Supp. 1474, 1476 (D.Utah 1994); *Beck v. Board of Regents of State of Kan.*, 568 F.Supp. 1107 (D.Kan.1983). Put differently, if past improprieties are shown to have occurred, disqualification is appropriate where "the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case." *Kleiner*, 751 F.2d at 1210.

In the same vein, "a violation of professional ethics rules does not alone trigger disqualification ...; rather, a trial judge should primarily assess the possibility of prejudice at trial that might result form the attorney's unethical act." *Papanicolaou*, 720 F.Supp. at 1083. As one court has recognized, however, courts must be ever mindful that

[t]he preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount. Recognizably important [is the party's] right to counsel of her choice.... [That] consideration [ ] must yield, however, to considerations of ethics which run to the very integrity of our judicial process.

*Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir.1975).

The Special Masters have recommended that this court deny the defendants' motion to disqualify Ms. Silver, despite their finding that "Ms. Silver engaged in conduct that was knowingly misleading." *Report and Recommendation* at 32. The basis of this determination seems to have been two-fold. First, the Special Masters concluded that Ms. Silver's conduct in misleading Mr. Hellwig was not seriously detrimental to the defendants or to the security of the facility. The Special Masters concluded that despite Ms. Silver's conduct in misleading Mr. Hellwig, there was no prejudice either to the defendants or to the integrity of the litigation before this court.

The second basis for the Special Masters' recommendation against disqualification is their conclusion to the contention implicitly raised by the defendants, that Ms. Silver should be disqualified because she exercised extremely bad judgment in divulging security sensitive information to the inmate representatives and then denying that she had done so when the county investigated the allegation. The Special Masters concluded that while *evincing bad judgment*, Ms. Silver's conduct in disseminating this information was insufficient to disqualify her.

With all due respect to the Special Masters, I must disagree with their assessment on these points, particularly in light of events which occurred subsequent to the issuance of their report. This court views Ms. Silver's conduct in disseminating the officer staffing information—which the Special Masters determined was only implicitly argued by the defendants—and the disclosure of the time and place of the outside medical appointment to Quran Johnson to be at the heart of this matter.

The philosophy behind the security procedures developed at the Jail Annex has been described as one of "carefully-cultivated uncertainty." This philosophy seeks to deter inmate misbehavior—attacks on other inmates or officers and escapes—by keeping them unsure as to when and where corrections officers may be in the vicinity. By providing detailed information concerning officer staffing at the Jail Annex, Ms. Silver recklessly breached an essential aspect of the security measures at the facility. While Ms. Silver, in her discussions with Mr. Hellwig, made much of the fact that she had not provided the inmates with the actual officer staffing schedules, what she did provide was a detailed memorandum summarizing what she viewed as key deficiencies in staffing at particular times. This memorandum therefore was considerably more useful than the unanalyzed data contained in the actual officer staffing schedules.

Ms. Silver attempted to minimize the significance of what she had done by pointing out that the "officer staffing information ... sent to the inmates was not current information, and the inmates know even more about the officer staffing problems than the information reflected either in the memorandum or in the Officer Staffing Schedules themselves." *Certification of Susan R. Silver*, February 26, 1996 at ¶ 30. Ms. Silver also tried to justify the dissemination of this material by contending that the level of officer staffing was an issue in the underlying litigation, and thus, a legitimate area of concern for the inmates. I find these assertions to be quite disingenuous.

First, with respect to her claim that the inmates know more about staffing issues at the Jail Annex, the plaintiffs provided no evidence to support this statement. Moreover, as noted by the Special Masters:

Whatever knowledge the sizable class of inmates may have as a whole, it cannot be seriously maintained that any individual inmate had as much staffing knowledge as is contained in Ms. Silver's memorandum or in the schedules themselves. An individual may know the situation in his or her particular area of the Jail Annex, but the nature of jail life does not permit the type of pooling of information that is reflected in Ms. Silver's memorandum.

*Report and Recommendation* at 20.

Second, the plaintiffs' contention that the information contained in the memorandum was dated is unpersuasive. The information was indeed current when it was first sent to the inmates in late September or early October, 1995. The memorandum is dated September 29, 1995 and analyzed the schedules for the period between August 1, 1995 and September 22, 1995.

And third, while officer staffing may have been an issue in the underlying litigation, Ms. Silver herself testified that it was not necessary for the inmates to have the detailed information contained in her memorandum:

Q. Do you think the inmates needed to know the particular details of 60 days of scheduling in order to understand what your position was going to be in the settlement?

A. Well, it's actually 53 days of scheduling, but no, they don't need to know that level of detail, which is the reason why I agreed not to give them that level of detail and since September 9, I never have and before September 29, I never did.

Q. That's right, before September 29, you had never found it necessary to send that level of detail to the inmates to comply with your ethical obligation to the client to inform the client about what you do. Is that correct?

A. I have an ethical obligation to keep them informed.

I do not have an ethical obligation to keep them informed to that level of detail, which is why I am able to agree not to do so, now that I'm aware of the county security concerns

*Testimony of Susan R. Silver*, April 18, 1997 at 58–59.

In determining that disqualification was not warranted in this case, the Special Masters appear to have concluded that Ms. Silver was only attempting to vigorously represent her clients, and that "[b]ut for the fact that her clients are inmates in a correctional institution, no one would think to criticize her for

such conduct." *Report and Recommendation* at 29. The point, however, is that her clients are indeed inmates in a correctional institution, and that fact cannot be simply pushed to the side in assessing the wrongfulness of Ms. Silver's conduct. The Special Masters stated:

> While an attorney, like any other person, may not knowingly aid or abet the commission of a crime ... we are not at all certain that an attorney representing inmates is expected to presume that her clients will use information provided with an innocent purpose for an improper purpose. The question of whether a lawyer representing a class of this sort has some sort of special duty to expect the worst from her clients is one that has not been decided, or even discussed in any of the precedent cited to us.

*Id.* (citation omitted). I cannot agree with this assertion. The very real dangers in jails and prisons of escapes and attacks on prison staff as well as other inmates are quite evident to any lay person let alone an attorney, such as Ms. Silver, who has been intimately involved in their operations for many years. Ms. Silver gave inmates detailed information of when and where officers were not on duty. As Ms. Silver admitted at the April, 1997 hearing, there was absolutely no need on the part of the inmates to have this level of detailed information. Under these circumstances, I do not believe that to "expect the worst from her clients" is somehow on the fringes of rational thought. The necessity of strict security measures in prisons and jails is based on the reasonable presumption that under certain circumstances prisoners, if left to their own devices, will indeed do their worst.

In this case, evidence was presented that at least one inmate did escape on the strength of information obtained from Ms. Silver's memorandum. In his certification, Billy Pereira stated that he escaped form the Jail Annex on October 26, 1995 "after having read a memorandum ... that highlighted the posts that lacked supervision by corrections officers." *Certification of Billy Pereira*, January 19, 1996 at ¶ 1. That memorandum, he stated, indicated that there were no guards on duty near Satellite 3. Two days after reading the memorandum, Mr. Pereira escaped through Satellite 3. The plaintiffs have questioned whether Mr. Pereira could have digested the memorandum in the five minutes he had possession of the document. This court, however, finds Mr. Pereira's certification to have been credible. There appears no reason why he would have lied in the certification, as he was not promised anything in return. *See id.* at ¶ 4. Moreover, I do not find his testimony to have been inherently incredible. Mr. Pereira did not state in his certification that he carefully read through and digested the entire memorandum. Rather, he stated only that he determined from the memorandum that no security personnel was on duty on Satellite 3. Surely, five minutes was enough time to gain this valuable information.

To a great extent, however, the wrongfulness of Ms. Silver's conduct does not turn on Mr. Pereira's escape. Nor does it truly matter that no other escapes were connected to the memorandum. The dissemination of the information concerning officer staffing at the Jail Annex was wrongful because it unjustifiably increased the *risk* of security breaches. The fact that more escapes did not result or other acts of inmate misbehavior perpetrated was simply fortuitous, and thus, in no way diminishes the very real risk and danger that Ms. Silver created.

Had this court been confronted only with the dissemination of the officer staffing information, her disqualification would certainly have been a close question. This court may very well have accepted the Special Masters' conclusion that "the experience of this motion will cause Ms. Silver and other counsel from the Public Defender's office to carefully review materials provided to their clients so as to avoid providing detailed information on matters affecting jail security." *Report and Recommendation* at 31. Based on the Quran Johnson affair, however, which occurred after Ms. Silver had explicitly assured this court that she appreciated the security concerns at the jail facilities, disqualification appears to be the only reasonable sanction which this court can impose to maintain safe-

ty at the jail facilities as well as the integrity of this case.

Ms. Silver, contrary to direct assurances to this court, clearly did not appreciate the security concerns at the Jail Annex. As noted above, Quran Johnson was informed by a letter from Ms. Silver that he would receive outside medical attention for his ailment, and that such appointment would occur on May 23, 1997 at 11:00 a.m. While there is no indication that Mr. Johnson attempted to escape on the strength of this information, the disclosure of this security sensitive information clearly impacts upon this court's determination of the propriety of Ms. Silver's continued participation in this case. The plaintiffs do not dispute that this breach occurred, but contend that it was merely an oversight caused by an extremely heavy caseload undertaken by Ms. Silver.

This court cannot and will not excuse Ms. Silver's conduct based on her assertions of too much work and oversight. Before this court, Ms. Silver stated unequivocally that she would never send this type of information to her clients:

A. I receive frequently medical information with dates as to when inmates are scheduled to receive surgery in outside hospitals or clinics or outside medical specialists appointments to evaluate their medical problems.

Back in, I believe early 1994, Mr. Del Plato mentioned to me that the county treats that information as being confidential because if inmates knew when they were going to be leaving jail grounds for a medical appointment, that poses a security threat in terms of making an escape easier.

Ever since Mr. Del Plato made that comment to me, I have been very careful to never tell inmates when they're going to be leaving the grounds for a medical appointment or surgery.

*Testimony of Susan R. Silver,* April 18, 1997 at 113. Ms. Silver was also reminded of the security protocols concerning outside medical appointments by Ronald Manzella, the Director of Corrections for Essex County. In his Second Certification, Mr. Manzella stated:

Susan Silver, the attorney for the plaintiff class, has been reminded in my presence that because of security concerns, it is essential that when medical appointments are scheduled for the inmates, she can provide the inmates only with a general response, but absolutely cannot tell them when and where the care will be provided. I can recall at least three occasions when I personally spoke to Ms. Silver or her substitute, Cindy Salisbury [*sic*], Esq., about this protocol. I can recall at least one occasion when the protocol was discussed with Ms. Silver in the presence of the Special Masters.

*Second Certification of Ronald H. Manzella,* May 30, 1997 at ¶ 7.

At the very least, this conduct on the part of Ms. Silver negatively impacts on her repeated assurances that she appreciated and understood the security sensitive nature of much of her work. One would have assumed that having explicitly assured this court that conduct of this type would not occur again, Ms. Silver would have taken particular care in handling security sensitive information. This assumption was evidently not well founded, and in this light, it is equally clear that Ms. Silver's assurances that these types of security breaches would not occur again were simply hollow, delivered to appease the concerns of both this court and the defendant jail officials.

In response to the Quran Johnson affair, as well as the dissemination of the officer staffing information, the plaintiffs appear to have implemented a new protocol which requires that any material sent to inmates be reviewed by a supervisor in the Public Defender's Office. Based on the implementation of this new protocol, the plaintiffs once again attempt to assure this court that security breaches will not occur again. Based on the history of this case, I can no longer accept these assurances. If Ms. Silver were a lower level attorney without significant contact with the inmates, this new procedure may certainly be sufficient to ameliorate this court's anxieties. Ms. Silver, however, is not a low level attorney. She is the principal attorney in this case representing the inmates, and as such, has extensive communi-

cation with her clients, both in written correspondence and personal meetings. Under these circumstances, I cannot be assured that having a supervisor review materials sent to the inmates for security sensitive material is sufficient.

This court finds that the dissemination of the officer staffing information to the inmates and Ms. Silver's disclosure of security sensitive information to Quran Johnson compel this court to disqualify Ms. Silver from further representation of the plaintiffs. In their Report and Recommendation, the Special Masters determined that a court's principal concern in resolving a disqualification motion was the integrity of the litigation before it. Disqualification is warranted, they found, when there is the " 'possibility of prejudice at trial that might result from the attorney's unethical act.' " *Report and Recommendation* at 34 (quoting *Papanicolaou,* 720 F.Supp. at 1083). Based on this standard, the Special Masters concluded that no prejudice existed in this case, reasoning that "[t]rial of the case is an assessment of the proofs and the law ... [and][i]t is not an assessment of the lawyers' credibility." *Id.*

This court finds that the Special Masters clearly erred in this assessment and have taken a overly narrow view of the requirement that there must be the possibility of prejudice at trial. While in an ordinary case the appropriate standard may very well be the potential prejudice at trial, this is not an ordinary case. Applying this standard in an overly formalistic way to this particular matter would ignore the unique nature of this case. These two class action lawsuits filed on behalf of the inmates concern the very significant issue of the conditions of confinement at the Essex County Jail and Jail Annex. Each case was settled, and many aspects of jail operations are now governed by a series of consent orders. This court has, and has had for quite some time, the responsibility of overseeing compliance with those consent orders. At this stage, this matter will in all likelihood not go to trial. Accordingly, the appropriate standard to be applied in this case is whether there will be prejudice to the continued enforcement of the consent decrees. I find that Ms. Silver's conduct has prejudiced the continued enforcement of the consent decrees.

To ensure compliance with the consent orders, it is imperative that information concerning jail operations be provided to the plaintiffs' representatives and this court. Much of this information no doubt contains security sensitive materials which the defendants would not ordinarily provide to any outside parties. That the defendants must do so to ensure compliance with the consent orders, however, in no way diminishes the sensitive nature of this information. Due to Ms. Silver's conduct, the defendants have a legitimate concern over whether such information will be treated by Ms. Silver with the appropriate level of security which it requires. This legitimate concern arises from the simple fact that the defendants are ultimately responsible for maintaining the security of the facilities, in order to protect the public, the staff, and the inmates. The concern over maintaining the appropriate level of security may lead the defendants, consciously or subconsciously, to limit their disclosure of information to Ms. Silver. Accordingly, the defendants are faced with the dilemma of freely providing important yet sensitive information to Ms. Silver, which may create the risk of a breach of security, on the one hand, and curtailing the disclosure of that information, thereby risking non-compliance with the consent orders.

The dilemma faced by the defendants will clearly affect this court's truth-finding function, as well as its efforts to ensure full and continued compliance with the consent orders. The issues concerning the conditions of confinement raised in these class actions are of great import not only to the inmates themselves but also to the public. Yet these significant issues cannot be properly addressed by this court or the parties in an atmosphere where the continued security of the facility is jeopardized. Security breaches of the type resulting from Ms. Silver's conduct can only undermine this court's duty to oversee compliance with the consent orders on the part of the defendants. The continued viability of this court's oversight function over the Essex County Jail and Jail Annex,

therefore, can suffer no instances of recklessness as evidenced by Ms. Silver's conduct.

■ This court is cognizant of the policy that in determining whether an attorney should be disqualified, a court should be mindful that although a party has no right to particular counsel, *see International Business Machines Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978), " 'a party's choice of counsel is entitled to substantial deference,' " *Alexander,* 822 F.Supp. at 1114 (quoting *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.,* 808 F.Supp. 1200, 1208 (E.D.Pa.1992)). This court is also well aware of the fact that Ms. Silver has represented the plaintiff class for quite some time. However, I do not believe that these considerations outweigh the need for disqualification in this case. This is not a case where, for instance, we are on the eve of trial and disqualification of a party's attorney will work an extreme prejudice on that party. Indeed, this court notes that Ms. Silver took an eight month leave of absence in 1996. During that time, her duties were undertaken by Deputy Public Defender Cindy Salsbury, Esq. Accordingly, this court finds that the plaintiffs' interest in Ms. Silver's continued participation in this case does not outweigh the need for this court to preserve the integrity of these proceedings. The parties have not provided suggestions of lesser sanctions which would assure the orderly, appropriate, and focused conduct of this matter. The integrity of these proceedings can be maintained, unfortunately, only by the disqualification of Ms. Silver.[8]

---

**8.** The plaintiffs have alleged that the defendants' brought the present disqualification motion simply for strategic purposes to rid themselves of a zealous and effective advocate. Courts recognize that disqualification motions can be utilized for strategic purposes. *See Alexander,* 822 F.Supp. at 1118–19; *Kevlik,* 724 F.2d at 848. When it appears that a motion to disqualify has been made primarily for strategic or tactical purposes, courts " 'have been extremely reluctant to dis-

qualify attorneys.' " *Alexander,* 822 F.Supp. at 1118 (quoting *Nemours Found., v. Gilbane, Aetna, Federal Ins. Co.,* 632 F.Supp. 418, 430–31 (D.Del. 1986)). Although this case has been hard fought throughout and at times contentious, no credible evidence was presented to this court to support a finding that the defendants' primary purpose in moving for disqualification was for strategic or tactical purposes.